IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PETER KIEWIT SONS', INC., | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV365 |
| | ) | |
| v. | ) | |
| | ) | |
| WALL STREET EQUITY GROUP, | ) | FINDINGS, RECOMMENDATION |
| INC., WALL STREET GROUP OF | ) | AND ORDER |
| COMPANIES, INC., SHEPHERD | ) | |
| FRIEDMAN, and STEVEN S. WEST, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on Defendants' motion for protective order, (filing no. 158), Defendants' motion for leave to amend their amended answer, (filing no. 179), and Plaintiff's motion for sanctions, (filing no. 135).  For the reasons set forth below, Defendants' motion for protective order is granted in part and denied in part, Defendants' motion to amend is denied, and Plaintiff's motion for sanctions is granted in part and denied in part.


FACTUAL BACKGROUND


This case involves claims by Plaintiff Peter Kiewit Sons', Inc. ("Kiewit") against Defendants Wall Street Equity Group, Inc. ("WSE'"), Wall Street Group of Companies, Inc. ("WSG"), Shepherd Friedman ("Friedman"), and Steven West ("West")(collectively "Defendants") for the alleged violation of various aspects of federal and state trademark law, unfair competition, and commercial misrepresentation.  Filing No. 1.

Plaintiff is a construction and mining company with its principal place of business in Omaha, Nebraska.  Defendants are in the mergers and acquisitions business and assist

with introducing potential buyers to clients who are interested in selling their business.  As part of this process, Defendants require their clients to pay Defendants for a valuation of their businesses.  Defendants' quoted fees for the valuations ranged from $19,000 to $22,000 in one instance, (filing no. 11, p. 5), and from $20,000 to $30,000 on a second occasion, (filing no. 11, p. 10).

Plaintiff alleges the Defendants have misused the service mark "Kiewit," U.S. Service Mark Registration No. 2569239 (the "Kiewit Mark" or the "Service Mark"), in Defendants' attempts to solicit clients.  Specifically, Kiewit contends Defendants have improperly used the Kiewit Mark by "falsely representing an association with and/or authorization from Kiewit to Defendants' customers and potential customers."  Filing No. 1, ¶9.  Plaintiff concurrently filed a motion for a temporary restraining order in order to prevent Defendants from using the Kiewit Mark in connection with any representations Defendants were making to clients or potential clients, or otherwise representing that Defendants were associated with Kiewit.  Filing No. 7, ¶¶1 & 2.

In support of its motion for a temporary restraining order and preliminary injunction, Kiewit submitted copies of two letters between Defendants (or a representative of Defendants) and third parties in which Defendants, or representatives thereof, suggested Kiewit as a potential buyer of the potential client's business.  Filing No. 11.  For instance, a letter dated April 23, 2010 to Hladky Construction Corp. signed by Defendant Steven West stated he had enclosed "[b]ackground on buyer, Kiewit" and indicated he would "seek out 2 additional buyers to create competition for Kiewit."[1]  Filing No. 11, pp. 4-5.  Plaintiff

---

[1] A similar letter from WSG, dated June 25, 2008, addressed to Waterfront Marine Construction and signed by Shepherd Friedman, was also submitted as evidence.  Filing No. 11, p.9.

alleges it was not aware the name "Kiewit" was being used in this capacity and asserts this conduct was unauthorized and amounts to a misuse of the Kiewit Mark. Defendants did not oppose the motion for a TRO,[2] and the TRO and preliminary injunction were ordered by the Honorable Laurie Smith Camp on October 4, 2010. Filing No. 17.

Defendants filed an answer to the Complaint denying Plaintiff's allegations and alleging three affirmative defenses: 1) Plaintiff did not establish a right to an accounting; 2) Plaintiff's claims are barred by the doctrine of unclean hands; and 3) Plaintiff suffered no damages or failed to mitigate damages. Filing No. 28, ¶¶ 40-42. The parties completed their Rule 26(f) planning report on December 6, 2010. Filing No. 36. The final progression order was entered on December 14, 2010. Filing No. 38.

On February 2, 2011, Defendants moved for Rule 11 sanctions against Kiewit and its counsel, asserting the claims lacked any factual or legal basis.[3] (Filing No. 39). The motion was denied. Filing No. 49.

The parties commenced written discovery and depositions in February of 2011 with only minor skirmishes between the parties.[4] On August 1, 2011, Kiewit filed a notice of

---

[2] Defendants did not concede any wrongdoing; they simply agreed not to use the Kiewit name in additional correspondence to potential clients.

[3] Defendants filed their motion for sanctions before the expiration of any of the major discovery deadlines, including the deadline for mandatory disclosures. As the court noted in its memorandum and order, dated April 18, 2011, (filing no. 49), Defendants essentially attempted to argue a dispositive motion under the guise of a Rule 11 motion for sanctions.

[4] For example, the discovery deadlines were extended due to the parties' inability to agree on certain deposition dates. Filing No. 59.

3

intent to serve a Subpoena Duces Tecum on Arthur Bertke.  Filing No. 73.  Mr. Bertke is the landlord of the building where the corporate defendants' offices are located and Defendants' records are kept.  Bertke also provided certain computer services for Defendants, such as data recovery, registering domain names, and server storage.  Filing No. 137, Ex. A.  The subpoena commanded Bertke to produce the following documents and electronically stored information:

> [C]opies of any and all computer electronically stored information, including, but not limited to, all backup data and/or tapes regarding accounts receivable, money paid for business valuations, financial statements, and any correspondence referencing [Kiewit] or the word "Kiewit" for Wall Street Equity Group, Inc., Wall Street Group of Companies, Inc., Shepherd Friedman and Steven S. West for the time period from January 1, 2008 to the present time.

Filing No. 73, p. 3.  Defendants objected to Plaintiff's intent to serve the subpoena on Bertke.  Filing No. 78.

On September 9, 2011, Kiewit filed a motion for an order authorizing service of a Subpoena Duces Tecum to Bertke. Filing No. 87.  Kiewit asserted that Bertke maintained back-up files of Defendants' electronic business records.  Kiewit claimed Defendants failed to provide complete answers to Plaintiff's discovery requests, and stated it believed Defendants' electronic files likely contained documents responsive to Plaintiff's discovery requests.  Filing No. 88.  In support of its motion, Plaintiff filed an affidavit of Tara Bethel, a former employee of defendant WSE.  Bethel swore that she "observed at least one-hundred (100) instances in which a WSE employee would represent to a prospective client-business owner that Peter Kiewit Sons', Inc. was a ready, willing, and interested buyer of the prospective client-business owner's business."  Filing No. 119-1, ¶ 8.   She stated Defendants drafted proposals for clients and saved the proposals in computer files named

4

"Carla" and "Carlita," (filing no. 119-1, ¶7), and Mr. Bertke maintained Defendants' electronic files.  Filing No. 119-1, ¶¶ 5-7.

On October 7, 2012 Defendants objected to the issuance of the subpoena on Bertke, arguing that Bertke did not have access to or maintain a copy of the electronic files created by Defendants.  Filing No. 117; Filing No. 117-12, West Aff. ¶3 (dated October 7, 2011); Filing No. 117-13, West Aff. ¶32 (dated October 7, 2011); Filing No. 117, p. 18. Defendants further denied that Bertke possessed a back-up copy of WSE's and WSG's business records.  Filling No. 117-12, West Aff. ¶ 3; Filing No. 117-13, West Aff. ¶32 Filing No. 117, p. 18.  Defendants also moved to strike the affidavit of Tara Bethel asserting it was "full of blatant misrepresentations."  Filing No. 121, Verified Motion to Strike Affidavit, ¶4.  Defendants filed two affidavits from employees who stated Bethel was not in the same office as the company telemarketers and that during the time Bethel worked for WSE, "the name 'Kiewit' was never mentioned in the office where Bethel worked, verbally or in writing."  Filing Nos. 121-3, ¶¶ 4-5; 121-4, ¶¶ 4-5.  A third affidavit, submitted by West stated: "During the time Bethel worked for WSE, the name 'Kiewit' was mentioned by me and only on the one occasion I spoke to Mike Hdladky of Hdlaky Construction in April 2010."  Filing No. 121-5, ¶5.

On September 28, 2011, the plaintiff filed a Motion to Compel, (filing no. 105), and a Motion for Leave to File an Amended Complaint.  Filing No. 101.  Plaintiff's motion to amend sought leave to raise allegations to pierce the corporate veils of WSG and WSE, and to hold Friedman and West personally liable to the Plaintiff.  The Motion to Compel sought a court order directing Defendants to supplement their discovery responses related to Defendants' business transactions and valuations, finances, and records containing the term "Kiewit."  Filing No. 105.

Defendants objected to the motion to compel and argued strenuously that most of Plaintiff's discovery requests amounted to a "fishing expedition" and that it did not possess any documents containing the word Kiewit.   Defendants further asserted that many of the documents, such as its customer lists and financial documents, were protected by confidentiality and, if produced, would severely damage the business.  Defendants submitted the following evidence in opposition to the motion to compel:

- Affidavit of Pamella Romano stating that she "searched the computers of the defendants . . . [and] [t]he word 'Kiewit' does not appear anywhere in the computers . . . ."  Filing No. 115-3, ¶¶ 2-3.

- Affidavit of Defendant Steve West, dated October 7, 2011, swearing to the following:

  -- Defendants' "standard practice" has been not to "save documents concerning potential clients unless they actually become clients." Filing No. 115-16, ¶ 22.

  -- Defendants have not 'failed and refused' to produce documents as to the name of 'Kiewit'; there simply are none.  Filing No. 115-16, ¶ 31.

  -- WSE's landlord [Bertke] does not have and does not maintain a copy of electronic files created by Defendants.  Filing No. 115-16, ¶ 32.

  -- [T]here exist no files referencing Plaintiff.  Filing No. 115-16, ¶ 33.

  -- To review all records at WSE's place of business, in order to locate any which name or refer to Plaintiff, of which there are none, would cause undue burden or expense.  Filing No. 115-16, ¶ 38.

  -- Defendants have fully and honestly responded to every notice of deposition and discovery request.  Filing No. 115-16, ¶ 45.

A hearing was conducted on the pending motions on October 12, 2011 and the undersigned heard argument on the motions to amend the pleadings, the motion to issue a

6

subpoena, the motion to strike the affidavit of Tara Bethel, and the motion to compel.  With regard to the motion to strike, Defendants' counsel argued passionately and unequivocally that Tara Bethel was "a documented liar."   Filing No. 124, Audio File at 48:00 - 50:00. Counsel further offered as "an officer of the court" to attest that "almost everything in [Bethel's affidavit]" is a "lie."[5] Filing No. 124, Audio File at 48:00 - 50:00.  Specifically, defense counsel argued that Kiewit was using the affidavit to try and get records from Bertke that "he does not have" and that Kiewit was never mentioned while Bethel was working for Defendants.  Id.

The undersigned granted the plaintiff's motion to amend beyond the motion deadline because the facts underlying Plaintiff's claim to pierce the corporate veil were not known, and could not reasonably have been discovered prior to deposing Defendants' corporate representatives.  See Filing No. 124, Audio File at 26:30 - 28:40.   Therefore, Plaintiff had exercised due diligence and good cause existed for permitting the complaint to be amended beyond the deadline set by the court's scheduling order.  Id.

For the reasons stated on the record during the hearing, and in the court's memorandum and order filed thereafter, the court granted the plaintiff's motion to issue a subpoena, granted in part and denied in part the motion to compel, and denied the motion to strike the affidavit of Tara Bethel.  Filing No. 128.  The court determined Defendants' essentially non-existent document retention policy rendered them an unreliable source of discovery thereby "open[ing] avenues of third party discovery which would have been

---

[5] The undersigned warned defense counsel that she appeared to be testifying as a witness regarding Ms. Bethel's credibility (character for truthfulness or untruthfulness), and that doing so would likely disqualify her from continuing to serve as counsel for the defendants.  Filing No. 124, Audio File at 1:31:00 - 1:34:00.

closed had the defendant retained documents consistent with standard business practices .
. . .” Filing No. 128, p. 12.  The court ordered Defendants to respond to the majority of the
disputed interrogatories and requests for production.  The memorandum and order was filed
on October 25, 2011.

On November 3, 2011, Plaintiff moved for sanctions, alleging Defendants were
playing a “shell game” with the electronically stored documents requested in the Bertke
subpoena.  Filing No. 135.  The Plaintiff alleged:

- Prior to October 24, 2008, Bertke maintained computer files for West which
were which were kept in a separate server room (“Server Room”) controlled
by Bertke.  Filing No. 137, Ex. B, ¶¶ 7, 9-10.  From October 24, 2008 until
September 20, 2010, West maintained servers located in his own office to
store electronic files.  Filing No. 137, Ex. B, Bertke Aff.  ¶ 9.

- On or about September 20, 2010, a server was purchased and installed in the
Server Room and all of “the historical electronic data and files stored on
West's previous server was transferred onto the new server (“Server 1") in the
Server Room.  Filing No. 137, Ex. B, Bertke Aff.  ¶ 10.

- In July of 2011, West directed Bertke to move Server 1 back to West's office.
Filing No. 137, Ex. B, Bertke Aff. ¶ 11.

- On August 1, 2011, Plaintiff filed a Notice of its Intention to Serve Subpoena
Duces Tecum on Bertke.  Filing No. 73.

- In August of 2011, West instructed Bertke to install another server (“Server
2") to be maintained in Bertke's server room.  “Some of the electronic files”
were copied from Server 1 to Server 2.   Filing No. 137, Ex. B, Bertke Aff. ¶
12.

- In early September 2011, West provided Bertke with an external hard drive
containing copies of Defendants' electronic files.  Filing No. 137, Ex. B,
Bertke Aff. ¶ 13.

- On October 5, 2011, West directed Bertke to move Server 2 to West's office. Filing No. 137, Ex. B, Bertke Aff. ¶ 12.

- On October 14, 2011, West instructed Bertke to copy the external hard drive West gave Bertke in early September 2011 onto an additional external hard drive. Filing No. 137, Ex. B, Bertke Aff. ¶ 13. Bertke did so and kept both of the external hard drives in a locked cabinet in his office. Filing No. 137, Ex. B, Bertke Aff. ¶ 13.

- The order granting leave to issue the subpoena on Bertke was issued on October 25, 2011. Filing No. 128.

- On Wednesday, October 26, 2011, West instructed Bertke to return to West the two external hard drives containing West's business records. Bertke returned those hard drives on October 27, 2011. Filing No. 137, Ex. B, Bertke Aff. ¶ 12.

- On October 28, 2011, Bertke received the subpoena issued by Plaintiff. Filing No. 137, Ex. B, Bertke Affidavit ¶ 15. But by that time, Bertke had handed the hard drives to West. Therefore, Bertke informed Plaintiff's counsel that he no longer possessed any of the electronic data and could not respond to the subpoena.

Plaintiff asserted West's actions were a deliberate attempt to deprive it of discoverable information and were conducted in bad faith. A hearing was held on the matter on November 8, 2011. Defendant West was instructed to bring the external hard-drives to the hearing. In anticipation of the hearing, Defendants submitted affidavits from West and Bertke alleging the following:

- On October 26, 2011, West observed the door to Mr. Bertke's office was open. Believing Bertke to be out of town and out of concern that the external hard drives might be stolen, West asked Bertke to return the external hard drives to West. Filing No. 139-1, West Aff. ¶¶ 4-10; Filing 139-2, Bertke Aff.

- West had an "independent third party back up [Defendants'] entire computer" on November 3, 2011. Filing No. 139-1, West Aff. ¶11.

9

- West had "no knowledge" Plaintiff would be serving a subpoena on Bertke on October 28, 2011.  Filing No. 139-1, ¶ 14.

- West's actions were intended to preserve and protect the electronic information.  Filing No. 139-1, ¶ 15.

- Bertke has provided computer support and has periodically housed Defendants' servers since their business relationship began in 1996.  Filing No. 139-2, Bertke Aff.

A hearing was held on the matter on November 8, 2011, with several witnesses giving testimony, including Bertke, West, and Romano.  With leave of the court, defense counsel, and the witnesses from Florida, participated in the hearing from the video-teleconference (VTC) facility located in the United States District Courthouse in Fort Lauderdale, Florida.  Defendants brought three external hard drives to the hearing; two black and one blue.  West testified that the black hard drives were the drives Bertke created at West's request, and the blue hard drive was the one made by the "independent third party" on November 3, 2011. West admitted that his previous affidavit statement that Bertke did not have access to electronic copies of Defendants' business records, (filing no. 115-16, ¶32) was not accurate. Filing No. 207, 48:13-21.  West further testified that when he asked Bertke on October 26, 2011 to return the external hard drives in Bertke's possession, West was "aware that in general there was substantial discussion about discovery" but he was not "completely" aware that the court had entered an order on October 25, 2011 granting Kiewit's motion to issue a subpoena on Bertke.  Filing No. 207, 45:22 - 46:4.

Romano testified that she was assigned the task of searching Defendants' computers for the term "Kiewit."  When asked about her ability to perform this work, she explained that she had graduated from high school and was two credits short of receiving an associate's degree in business management, (filing no. 207, 86:1-2), but she had no professional training

with computers and is not a "computer expert."  Filing No. 207, 91:25-92:2 & 95:9-14.
Bertke had shown her how to perform a key word search from her work station on the
"whole network" using the term "Kiewit," but she did not search the hard drives on any of
the individual work stations.  Filing No. 207, 88:3-11.  She testified her word search
returned only two documents, neither of which were the types of solicitation materials or
letters for which Plaintiff was searching. Filing No. 207, 92:14-22.

A ruling on Plaintiff's motion for discovery sanctions[6] was delayed until Defendants
submitted their computer equipment (including Server 2[7] and the external hard drives) for
forensic examination.  Since the defendants had participated in the hearing by VTC, at the
close of the hearing, defense counsel was ordered to take possession of the three external
drives and secure them as an officer of the court for delivery to the plaintiff.  The
undersigned ordered Defendants to make its computer equipment available to be examined
by Continuum Worldwide by November 16, 2011.

---

[6] At the November 8, 2011 hearing Defendants' counsel contended that motion for sanctions
could have been avoided altogether if Plaintiff's counsel had merely called her once it was
discovered West had asked Bertke to give him the hard drives.  Filing No. 207, 113:2-5.  Given the
attorneys' inability to agree on the simplest tasks in the case, the extraordinary number of discovery
motions and briefs filed to date, and the nature and tone of defense counsel's communications when
speaking to Plaintiff's counsel and the undersigned judge during prior and lengthy motion hearings,
the court finds defense counsel's assertion that a simple phone call would have rendered the motion
unnecessary to be extremely dubious.

[7] Defendants moved to clarify the order, specifying that they only were in possession of one
server – Server 2 – explaining that Server 1 had "crashed" "some months ago" and was then
"discarded."  Filing No. 152.  The court instructed Defendants to produce any servers or devices
which contained electronic data.  Filing No. 153.  The court did not, at that time, comment on the
propriety (or lack thereof) of Defendants disposal of the "crashed" server.  Id.

On November 10, 2011, Plaintiff filed an emergency motion to make the server, hard drives, and other computer equipment available for examination on Friday, November 11, 2011.  Defense counsel was leaving the United States for at least two weeks beginning November 12, 2011, and the plaintiff wanted possession of the external hard drives and Defendants' servers imaged[8] without having to wait for defense counsel to return from that trip.  The court granted Plaintiff's motion.  Filing No. 160.

Continuum Worldwide representative Rick Clyde traveled to Florida on November 11, 2011 and commenced imaging Server 2 at Defendants' offices.  Filing No. 182-3, Clyde Aff. ¶ 4.  Server 1 was not available for imaging; West had thrown it in a trash dumpster, without the approval of Kiewit's counsel or the court, sometime between August 20, 2011 and November 11, 2012.  Filing No. 239, 97:24-99:13.  One of Defendants' employees, Richard Calabria, was present while Clyde imaged Server 2.  Filing No. 182-3, ¶ 9.  Clyde was also given three external hard-drives by Bertke which Clyde transported to Nebraska for imaging.  Filing No. 182-3, Clyde Aff.  ¶ 11.

Clyde completed the server imaging and returned to Omaha to begin searching for any documents that contained the word "Kiewit."  At the court's order, Plaintiff submitted a supplement to its motion for sanctions providing a preliminary report from Continuum.  Filing No. 182-1.  The report contained a finding that the keyword search of "Kiewit"

_____

[8], Because it would have been impractical for Defendants to ship their server to Nebraska for examination, a forensic examiner was sent to Florida to image the Server 2.  "To image a hard drive is to make an identical copy of the hard drive, including empty sectors."  See The Sedona Conference Glossary: E-Discovery & Digital Information Management (3d Ed. 2010).

returned 3,771 files, of which 181 were carved files.[9]  Filing No. 182-1, p. 2.  As to whether information had been intentionally removed or destroyed, the report stated the following:

> An analysis of the equipment examined did not show intentional removal of files or entries containing the word "Kiewit."  However, the equipment provided contained only copies of files originating on another server.  The server on which the files were generated was not presented at the time of acquisition, therefore, it is unknown whether any files containing the word "Kiewit" were removed.

Filing No. 182-1, p. 2

The undersigned ordered a hearing on Plaintiff's motion for discovery sanctions. Filing No. 184.  The hearing was held on January 30, 2012, and upon Defendants' motion, was reopened for additional evidence and argument on March 9, 2012.[10]  Clyde provided testimony regarding his search of the documents found on Defendants' computer equipment. Clyde testified that he was at Defendants' offices from 12:30 p.m. on November 11, 2011 until 5:00 a.m. on November 12, 2011 to conduct the imaging of Server 2.  Filing No. 239, 20:9-10.  Upon returning to Omaha, Clyde made duplicates of the hard drives which, due to the volume of data they contained, took approximately 6 days.  Filing No. 239, 23:9-13.

---

[9] According to the report "[d]ata carving is the process of extracting a collection of data from a larger data set.  Data carving techniques frequently occur during a digital investigation when the unallocated file system space is analyzed to extract files."  Filing No. 182-1, p. 2

[10] In addition to the motion for sanctions, the parties presented arguments regarding Defendants' motions for a protective order and to amend their amended answer.  The Defendants' motions are discussed infra.

The information was then made into a "working copy" and indexed.[11]   The indexing process took almost three weeks.  Filing No. 239, 25:14-16.

Clyde testified that the search produced 3,771 files containing the term "Kiewit."[12] Filing No. 239, 28:15-21.  Clyde was able to identify some letters and emails containing the word "Kiewit" which had not previously been produced.  These included letters to third parties that were very similar in content to the letters sent to Hdlaky Construction Corp. and Waterfront Marine Construction that prompted this lawsuit.  But at least one document that

---

[11] Clyde described the process of indexing as follows:

> The processing and indexing, it goes through the whole image which is an exact duplicate of everything that's on the servers or drives.  It goes into deleted space, unallocated space.  And it opens up containers that are zip files, e-mail type repositories, opens them up and extracts out all the documents.  Then it breaks – each documents, it breaks out and takes every single word out of that document and creates an index of where those words can be found in documents.

Filing No. 239, 24:19-25:2.

[12] Defendants printed out boxes of documents which, on their faces, do not contain the word "Kiewit."  See exhibit 105.  Defense counsel offered these documents into evidence to prove the number of instances of the word "Kiewit," as reported by Continuum, was greatly exaggerated. Clyde testified that Continuum's search looked for the term "Kiewit" in not only the visible text, but also the metadata of the documents.  Filing No. 239, 49:6-17.  "Metadata is generally not reproduced in full form when a document is printed to paper."  See The Sedona Conference Glossary: E-Discovery & Digital Information Management (3d Ed. 2010).

had previously been produced in the litigation was not found during Clyde's extensive search of the three hard drives and Server 2.[13]  Filing No. 239, 45:22-24.

At the hearings held on January 30 and March 9, 2012, West testified:

•      His initial representations to the court--that the Defendants only used Kiewit's name in two instances--were false.  Filing No. 239, 95:14-18 & 97:2-4.

•      West never asked Bertke to conduct a search of his electronic files even though Bertke had maintained Defendants' computer files "for many years." Filing No. 239, 97:13-23.  Instead, West asked Romano, "the most [computer] literate person [Defendants] had" to conduct a search of the electronic files.  Filing No. 239, 159:22-24.

•      West discarded Server 1 after it "crashed" in August of 2011, without having it examined by anyone else, including a computer expert.  Filing No. 239, 98:14-99:20.

•      After receiving notice of Plaintiff's motion for sanctions, Defendants hired a "separate expert" to make copies of their electronic data.  Filing No. 239, 161:6-9.

•      When presented with a list of businesses to which Defendants had sold valuations, a copy of which had been provided to Plaintiff by one of Defendants' former employees, West testified he did not know such a list existed.[14]  Filing No. 239,

_____

[13] One of the letters that the Continuum investigation did not find was the letter to Randy Sutton of Waterfront Marine Construction.  See  n. 1, supra; see also Plaintiff's Ex. 18; Filing No. 11, p. 9.

[14]  The list in question came from Defendants' former employee, Humberto Garcia. Defendants object to the use of the list claiming it contains trade secret information and was stolen by Garcia.  Garcia's former supervisor acknowledges that he provided Garcia with the list of company receipts to determine what commission Garcia might be owed, but Garcia was required to return the list.  Filing No. 236-1, ¶7.  If Garcia misappropriated the list, Defendants may have a claim against Garcia in Florida.  However, the fact remains – at the 30(b)(6) deposition, Defendants'

15

110:6-8.   During a prior 30(b)(6) deposition, West, as the corporate defendants' designated witness, had also testified that no such list existed.  Filing No. 248-7, 34:3-9.  However, he later testified that list was provided by Defendants to their former employee in a different lawsuit–clearly indicating that such lists were created by, or were in the possession of, Defendants at some point in time.

• Of the companies identified in communications discovered as a result of the forensic examination of Defendants' computer equipment, some had paid Defendants for valuations of their companies. Defendants solicited these clients by presenting Kiewit as a potential buyer for their respective companies.  Filing No. 239, 133:21-25.

• Defendants produced all of the responsive hard copies of documents in their possession.  Filing No. 239, 141:12-16.

• Defendants send out 10,000 letters a week and its telemarketers make 1- to 2,000 phone calls a day to solicit business.  Filing No. 239, 154:13-18.

• Server 1 experienced a "fried motherboard" and all of the information from Server 1 was transferred to hard drives that were subsequently transferred to Plaintiff.  Filing No. 239, 178:13-179:14.  West never identified who allegedly examined the server to conclude the motherboard was "fried," or who allegedly transferred all data on Server 1 to another drive.  All testimony of record indicates West was not able to perform these investigations and functions.

• Information from January 1, 2011 and after was transferred to Server 2.  Filing No. 239, 180:6-10.

Defendant Shepherd Friedman also appeared at the January 30, 2012 hearing and provided the following testimony:

---

representative, West, testified no such list existed.  The court has allowed the list into evidence for the sole purpose of confirming that the list exists and contains information responsive to Plaintiff's discovery requests.  West confirmed, to the best of his knowledge, that the lists from 2009 and 2010 appeared to be accurate.  Filing No. 239, 112:12-19 & 116:2-7.

- A file named "Carlita" was maintained by one of Defendants' "associates" to send out emails, and it contained copies of "various communications and correspondence" but it was nothing Friedman worked with directly.  Filing No. 239, 189:4-9.

- To the best of his belief, "once a contact was established with a potential client, information would be sent to them through the Carlita file.  This would include background on a potential buyer . . ."  Filing No. 239, 191:7-11.

- The "Carla" file "had records or allegedly had records of virtually every client [Defendants] had ever had any successful contact with."  Filing No. 239, 192:16-18.

- It was "quite possible" Defendants' telemarketers maintained a list of companies that were already being actively pursued and were not to receive further contact from the telemarketers.  Filing No. 239, 198:2-200:2.

- Defendants "kept lists of folks who paid [Defendants] monies to value their company in the hopes that they would sell them."  Filing No. 239, 207:2-5.

- Individual "producers" kept their own records.  Financial information was kept on the computer or in hard copies.  Filing No. 239, 214:17-18.

On March 9, 2012, the final hearing on the pending motions, testimony from Richard Calabria, president of Defendant WSE, was elicited.  Mr. Calabria testified:

- Calabria began working for Defendant WSE on February 21, 2011 as a part-time accountant and is currently the president of WSE.  Filing No. 259, 6:11-14.

- When he commenced his accounting duties for WSE, he began to use the Quickbooks accounting program to keep track of receivables and income, but the prior bookkeeper did not record that information.  Filing No. 259, 64: 8-18.

- No employee of Defendants had the knowledge or skill to perform the type of search Continuum performed.  Filing No. 259, 21:19-22.

- An outside vendor was brought in to back-up Defendants' computer files.  The outside vendor was not called to testify.  Filing No. 259, 27:17-28:2.

17

- Calabria is concerned that Defendants' clients will be harmed if Plaintiff is allowed to contact those clients.  Filing No. 259, 42:8-19.

- Calabria does not know whether any of Defendants' employees were required to surrender their files to determine if they contained documents responsive to the plaintiff's discovery.  Filing No. 259, 100:10-12.

- Defendants use an accounting program called "Quickbooks." The program could produce a list of clients who paid fees to Defendants.  Filing No. 259, 65:13-22.

The parties submitted additional briefs after the hearing and the matter is now fully submitted.[15]

ANALYSIS

Before the court are three separate motions: (1) Defendants' motion to amend its complaint; (2) Defendants' motion for a protective order; and (3) Plaintiff's motion for sanctions.

**Motion to Amend**

Once the time for amending a pleading as a matter of course has expired, a pleading may be amended only if the opposing party provides written consent or with leave of the court.  Fed. R. Civ. P. 15(a)(2).

---

[15]  Plaintiff's motion for leave to file a reply brief, (filing no. 255), is granted and the court reviewed and considered the proposed reply brief, (filing no. 255-1), as well as Defendants' responsive brief, (filing no. 256).

18

In general, courts are encouraged to allow amendments liberally. See Shen v. Leo A. Daly Co., 222 F.3d 472, 478 (8th Cir. 2000).  However, "[i]f a party file[s] for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule."  Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716 (8th Cir. 2008)(quoting Popoalii v. Corr. Med. Servs., 512 F.3d 488, 497 (8th Cir. 2008).  Indeed, the "good cause" requirement found in Fed. R. Civ. P. 16(b) for amending pleadings after the expiration of the scheduling deadline for doing so has passed "is not optional." Id. at 716.  "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." Id. at 716-17 (quoting Rahn v. Hawkins, 464 F.3d 813, 822 (8th Cir.2006).

The Defendants' initial answer was filed on November 12, 2010.  Filing No. 28.  The deadline for filing amendments to pleadings was February 11, 2011.  Defendants filed a motion to amend their answer on August 29, 2011.  The Plaintiff filed a motion to amend its complaint on September 28, 2011.  After extensive briefing and oral argument, the undersigned granted Plaintiff's motion to amend[16] and denied as moot Defendants' motion to amend.  Filing No. 123.  Defendants filed their amended answer in response to the amended complaint on October 30, 2011.

Defendants requested leave to amend their amended answer on December 12, 2011.  Defendants seek to add the following affirmative defenses: (1) Defendants' alleged use of the term "Kiewit" did not constitute trademark use and (2) Defendants' alleged use of the Service Mark constitutes nominative fair use.  Filing No. 181-4.

---

[16]  The undersigned conducted an analysis under Fed. R. Civ. P. 16(b) and specifically found good cause existed for Plaintiff's request for leave to amend.  Filing No. 124 at Audio File 26:30-28:40.

In an attempt to meet their burden of proving good cause exists, Defendants argue that a brief filed by Plaintiff in regard to a motion for protective order "brought into sharp and imminent focus Plaintiff's claim of a need and a right to contact Defendants' clients without court approval or oversight."  Filing No. 180, ¶ 11.   Further, "[d]iscussions with others in the industry . . . caused Defendants to consult trademark counsel, to determine whether they could now support trademark defenses."  Filing No. 180, ¶ 14.  Defendants allege that it was not until December 8, 2011 that "Defendants' learned from trademark counsel that they indeed now have the basis necessary to allege additional affirmative defenses against Plaintiff's claims, in the context of Plaintiff's demands to contact Defendants' client without any oversight. . . ."  Filing No. 180, ¶15.   Finally, Defendants argue their attempts to gain information regarding Plaintiff's intellectual property claims were thwarted by Plaintiff during discovery.  Filing No. 180.

From its inception, this law suit has centered on Plaintiff's allegations that Defendants violated federal and state law addressing intellectual property, including claims under the Lanham Act for trademark infringement, unfair competition and false representation.  See Filing No. 1, ¶¶ 13-39.  Plaintiffs further detailed the factual basis for their trademark claims in the Rule 26(f) Report and in response to Defendants' First Set of Interrogatories.  Filing No. 36.   Simply put, Defendants have been on notice from the moment they were served with the complaint that Plaintiff's primary claims alleged violations of federal and state trademark law.

Defendants' two alleged justifications for waiting almost a year after the deadline to amend their answer are unpersuasive.  Defendants first assert that the issue was not brought into "sharp and imminent" focus until Plaintiff professed its desire to contact Defendants'

clients without court supervision.[17]  Having been provided multiple opportunities to brief the matter, to present evidence, and to provide oral argument, Defendants have failed to provide any connection between Plaintiff's allegedly sudden revelation of intent to contact Defendants or former clients and the proposed additional affirmative defenses.  Case law provided by Defendants addressed the merits of the proposed affirmative defenses, but did not explain why they could not have been asserted until Defendants allegedly first learned of Plaintiffs' discovery intentions.   Indeed, the court can find no reason why Plaintiff's desire to conduct discovery on Defendants' clients or former clients would suddenly motivate the Defendants to assert affirmative defenses against the primary claims in this law suit.

Moreover, even if there was some connection between Plaintiff's discovery plan and the affirmative defenses, at the October 12, 2011 hearing, Defendants stated their concern with Plaintiff contacting Defendants' clients, (see Filing No. 124, Audio File at 52:05 to 52:25), providing clear evidence Defendants were aware of Plaintiff's plan of discovery. By October 31, 2011 Defendants' were certainly aware of the possibility of Plaintiff contacting current and former clients and could have moved to add the proposed affirmative defenses to their answer that day.

Defendants also assert that Plaintiff has stonewalled Defendants' discovery attempts to receive information regarding Plaintiff's trademark claims.  However, when pressed by this court to explain what information they could have received in discovery that would have sparked them into action earlier, Defendants can point to none. To the contrary, the Plaintiff

---

[17]  Of course, as is discussed infra, the Defendant is actually concerned about the level of court supervision.  This is an active lawsuit and none of the parties' discovery actions are undertaken without oversight of the court.

described the conduct that led to the filing of this suit in their discovery answers.  See Filing No. 186-5, p. 3, Answer to Interrogatory No. 5.  If Defendants believed Plaintiff was not being forthcoming in discovery, Defendants could have sought court intervention through a motion to compel.  They did not, thus their claims that Plaintiff's objections to discovery prevented Defendants from obtaining the information necessary to raise the proposed affirmative defenses rings hollow.

More likely the key to Defendants' delay in amending its answer can be found in their brief in support of their motion to amend – "[d]iscussions with others in the industry . . . caused Defendants to consult trademark counsel, to determine whether they could now support trademark defenses."  Filing No. 180, ¶ 14.  Waiting to contact an attorney with expertise in the subject area of the litigation does not constitute good cause for seeking to amend a pleading after the deadline has passed.  Accordingly, Defendants' motion for leave to amend is denied.

## Motion for Protective Order

A court will enter an order protecting a party from certain types of discovery only upon a showing of good cause.  See Fed. R. Civ. P. 26(c).  The party seeking the protective order bears the burden of demonstrating the existence of good cause for entering such an order.  See Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2, 197 F.3d 922, 926 (8th Cir. 1999).  A showing of "good cause" requires "a particular and specific demonstration of fact, as distinguished from . . . conclusory statements."  Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n. 16 (1981) (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2035, p. 265 (1970)); Miscellaneous Docket Matter, 197 F.3d at 926.  Thus, the parties seeking protection must show that specific prejudice or harm will result if no protective order is granted.  See Frideres v. Schiltz, 150 F.R.D. 153, 156

22

(S.D.Iowa 1993).  A determination of whether "good cause" for a protective order exists "must also include a consideration of the relative hardship to the non-moving party should the protective order be granted."  General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (8th Cir. 1973) (citing United States v. Kordel, 397 U.S. 1, 4-5 (1970)).  The court has broad discretion in determining whether a protective order is warranted and the degree of protection required.  Roberts v. Shawnee Mission Ford, Inc., 352 F.3d 358, 362 (8th Cir. 2003).

Plaintiff has stated it has no objection to the entry of a protective order, however the parties disagree over the amount of protection necessary.  At the heart of the dispute is whether, and to what degree, Plaintiff should be allowed to contact Defendants' current or former clients.  Plaintiff argues that it should be able to contact Defendants' clients and former clients in an effort to determine whether Defendants used the Kiewit Mark to solicit business and what, if any, representations Defendants made regarding their relationship with Kiewit. Defendants have strenuously argued that any contact with their current or former clients will cause Defendants' business to suffer "irreparable harm" because any such contact would violate confidentiality agreements Defendant entered into with their clients.  Defendants seek not only a protective order, but a court-controlled procedure for Plaintiff's contacts with Defendants' current or former clients wherein all correspondence with Defendants' clients would be conducted in writing.  See Filing No. 158, ¶¶ 22-23 & Filing No. 177, pp. 15-16.

It is true that courts are often reluctant to allow direct contact with litigants' clients or customers in lawsuits involving intellectual property disputes.  In general, these courts are concerned with the impact such contacts may have on the litigants' businesses,  such as when the parties are "fierce competitors" and the information sought could be gained by

23

other means.  See Joy Technologies, Inc. v. Flakt, Inc., 772 F.Supp. 842, 849 (D. Del. 1991).

Kiewit must first demonstrate the information it seeks from Defendants' clients is relevant and necessary.[18]  In re Remington Arms Co., Inc., 952 F.2d 1029, 1032 (8th Cir. 1991).  Kiewit has represented that it intends to ask Defendants' past and current clients to what extent, if any, Defendants represented Kiewit was an interested or potential buyer of the clients' businesses.  Kiewit seeks information regarding written correspondence and any other communications Defendants had with their clients regarding Kiewit's role in a potential sale.

In the Memorandum and Order regarding the initial discovery dispute in this case, the court noted that Defendants were an unreliable source of information because of their document retention[19] policies.  Filing No. 128, p. 11-13.   After many discovery disputes

---

[18]  For the purposes of this motion, Plaintiff assumes that the identities of Defendants' clients constitute trade secret information; thus, the court will not address that issue.

[19]  It may be more appropriate to refer to Defendants' policies as document "destruction" policies rather than "retention" policies since, according to Defendants, they kept very little correspondence with clients, including paperwork on completed transactions (as evidenced by the fact Defendants could produce few, if any, documents pertaining to Kiewit's completed transaction with Jett Industries, which Defendants facilitated).  Filing Nos. 106-3 & 106-7.  But there were, literally, terabytes of documentary information on Defendants' remaining server and its external hard drives, and client correspondence was located within this repository–leaving the court to wonder what the Defendants' actual policies were and are with respect to keeping documents.  The court need not answer that question because irrespective of any policies they may have for retaining documents, the Defendants have proven to be an untrustworthy source for searching and disclosing such documents in discovery.

and reams worth of discovery motions, briefs and other filings, the court's initial impression has been reinforced, not allayed. Defendants are simply not a reliable source of information.

At the heart of the matter is what representations, if any, Defendants made to their clients regarding Kiewit's interest in buying the clients' respective businesses. Initially, Defendants stated the Kiewit name was invoked only twice in communications with potential clients, and those contacts did not result in a business valuation or a completed sale. During his deposition, Hdlaky (one of the recipients of the correspondence Defendants initially acknowledged) stated that during follow-up communications with Defendants, they reiterated Kiewit's interest in purchasing his company. Defendants deny this assertion.

A forensic examination has been done: Defendants' initial assertion regarding the number of times it referenced Kiewit to a potential buyer was patently false. Additional contacts with other potential clients discussing Kiewit as a potential buyer were discovered. At least four of those clients paid Defendants for a business valuation. Filing No. 239, 133:21-25.

Defendants continue to attempt to use client confidentiality as a means of preventing Plaintiff from discovering relevant information. They argue Plaintiff has not asserted it has any damages in this case. However, in Lanham Act cases, successful plaintiffs are entitled to a defendant's profits for misuse of a service mark. 15 U.S.C. § 117(a). Without speaking directly to Defendants' clients regarding any written and verbal communications, Plaintiff has no reliable means of discovering exactly what, if any, representations were made to the clients beyond what appears in the limited written communications that have been produced. Plaintiff has met its burden of showing the information sought is relevant and necessary to its case.

25

Under <u>In re Remmington</u>, the court must balance the injury Defendants will suffer against Kiewit's need for the information.  Defendants argue their business will be essentially ruined, and they offered the testimony of no fewer than four experts to discuss the importance of confidentiality in the field of mergers and acquisitions.  Having reviewed the testimony of each expert, the court has no doubt confidentiality is viewed as essential in the field of mergers and acquisitions.  However, even the experts were not able to offer anything more than speculation as to what impact, if any, Plaintiff's discreet contacts with clients or former clients may have.

More importantly, Defendants share the majority of the responsibility for whatever peril they face if Plaintiff contacts Defendants' clients.  Defendants' lack of records retention, its disorganized method of storing the documents they do keep, and its lack of candor with the Plaintiff and this court during the discovery process convinces me that Plaintiff must contact Defendants' clients to reliably obtain relevant discovery.  For example, this court previously ordered Defendants to produce "every record . . . showing the number of appraisal and/or business valuation [Defendants] have sold since 2008" and identifying the number of appraisals and valuations sold since 2008 and the fee collected for each one of the appraisals or valuations sold.  Filing No. 128.  In response to the court's order, Defendants submitted a hodgepodge of documents including deposit slips and redacted bank statements that are barely decipherable and offer little in the way of identifying the number of valuations sold since 2008.  Had Defendants maintained or produced anything resembling complete and accurate records in an organized fashion, and had they been honest and forthright in the discovery process from the beginning, other discovery options might have been available for determining whether, and to what extent, Defendants profited from using the Kiewit name. At a minimum, Kiewit could have reviewed correspondence and contracts

26

without first contacting the clients. Based on that information, Kiewit, and this court, could have better decided to what extent Kiewit would be allowed to contact Defendants' clients.

But that option is not available. This court has no confidence that Defendants have fully met their discovery obligations or will fully respond to Plaintiff's discovery requests. The court will enter a protective order, but will not require the restrictions proposed by Defendants. Plaintiff will be allowed to contact Defendants' former and current clients, subject to the following restrictions as tailored for this case:

1)    Plaintiff may contact any of Defendants' clients or potential clients which were identified from the Continuum forensic examination as having received solicitation information from the Defendants which included the word "Kiewit."

2)    In addition,

   a.    Defendants shall provide Plaintiff with a listing of businesses or entities that purchased a business valuation, appraisal, or business profile from Defendants since January 1, 2008. Plaintiff shall identify any businesses on that list that are primarily engaged in the construction and/or mining business.[20]

   b.    Plaintiff may contact any of the businesses identified by the Plaintiff as engaged primarily in the construction and/or mining business and that have paid Defendants for a business valuation, appraisal, or profile.

   c.    Before contacting any specific business(es), the Plaintiff shall notify the Defendants of its intent to contact the business regarding the

---

[20] This information should be readily accessible; Defendant West testified that Defendants used Standard Industrial Classification codes to identify the nature of the business of potential clients. Filing No. 259, 118:2-6. Moreover, the Defendants are required to retain income tax records–which should include 1099s or other income records for the years in question.

27

matters in this lawsuit.  If Defendants have a record of which individual or individuals they corresponded with at the target businesses, Defendants shall provide, <u>in writing</u>, the contact information to Plaintiff within one week of receiving the Plaintiff's notice.

d.  To the extent possible, Plaintiff shall initiate contact with the individual or individuals at the target businesses which Defendants identified as the contact person.  If Defendant is unable to identify a specific contact person, Plaintiff may contact the president or owner (past and/or present) of the company or entity.

This method of discovery is aimed at ensuring Plaintiff's inquiries remain discrete and limited while providing Plaintiff an opportunity to discover information that either proves or disproves its claims.[21] <u>See, e.g.,</u> Gen-Probe, Inc. v. Becton, Dickinson & Co., case no. 09cv2319, 2010 WL 2011526 (S.D.Cal 2010) (allowing plaintiff to make contact with defendant's customers, but ordering plaintiff to make inquiry based on information provided by the defendant).

**<u>Motion for Sanctions</u>**

Plaintiff seeks sanctions for the Defendants' obstreperous conduct during the course of this litigation, particularly as it pertains to false statements in discovery responses and during court hearings, and its destruction and failure to produce electronic discovery.

Under the facts presented in this case, the court's authority to sanction the misconduct of parties and their attorneys is derived from the Federal Rule of Civil Procedure and the inherent power of the court.  See Fed. R. Civ. P. 11 & 37; Chambers v. NASCO, Inc., 501

---

[21] The court notes this is essentially identical to the procedure Defendants requested in the initial hearing on the motion for protective order on October 12, 2011.

28

U.S. 32, 44 (1991); Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 280 (8th Cir. 1995).     The court has the power to shape the appropriate remedy including default judgment, striking pleadings, an adverse jury instruction, and an award of attorney's fees and costs.  See Stevenson v. Union Pacific R. Co., 354 F.3d 739, 745-46 (8th Cir. 2004).   The most severe sanctions are reserved for those litigants demonstrating " 'blatant disregard of the Court's orders and discovery rules' [and] engaging in a pattern of deceit by presenting false and misleading answers and testimony under oath in order to prevent their opponent from fairly presenting its case."   Chrysler Corp. v. Carey, 186 F.3d 1016, 1022 (8th Cir. 1999).

### 1.     **False Affidavits and Testimony**.

Defendant West submitted several affidavits to the court in which he stated there were two and only two instances in which Defendants represented Kiewit as a potential buyer to clients. He further confirmed this testimony during a deposition.  During the course of this litigation, West has made the following statements under oath, which are now known to be false:

- Defendants suggested Kiewit as a potential buyer on only two occasions over several years.  Filing No. 174-3, ¶ 28 (Affidavit of Steven West).

- WSG's and WSE's standard practice is, and always has been, not to save documents concerning potential clients unless they actually become clients. That is why there are no documents referencing "Kiewit" in WSG's or WSE's computers. Filing No. 115-16, ¶ 22 (Affidavit of Steven West).

- West's inquiries and checking revealed no more than two occasions in which Kiewit was mentioned to prospective clients.  Filing No. 115-16, ¶¶ 29-33 (Affidavit of Steven West).

- Defendants have not "failed and refused" to produce documents as to the name "Kiewit"; there simply are none. Filing No. 115-16, ¶¶ 29-33 (Affidavit of Steven West).

- WSE's landlord, Bertke, does not have and does not maintain a copy of the electronic files created by Defendants. Filing No. 115-16, ¶ 33. Further, there are no files referencing Plaintiff. Filing No. 115-16, ¶¶ 32-33 (Affidavit of Steven West).

- Defendants have fully and honestly responded to every notice of deposition and discovery request. Filing No. 115-16, ¶45 (Affidavit of Steven West).

- The Defendants carefully researched their records, and over a period of three years, found only two instances of using name Kiewit other than brokering Kiewit's purchase of a twenty-five million dollar company.  Filing No. 199-1 (Deposition of Steven West taken July 12, 2011).[22]

- During the time Bethel worked for WSE, the name 'Kiewit' was mentioned by West only once; when speaking to Mike Hdladky of Hdlaky Construction in April 2010.  Filing No. 121-5, ¶5.

Defendants' counsel made numerous other statements in briefs strenuously arguing that no records existed beyond the two letters that were the basis for this lawsuit.  Filing No. 115, p. 40 (Defendants' brief in opp. to motion to compel) (Defendants have no documents mentioning Kiewit);  Filing No. 117, p. 16 (Defendants' brief in opp. to subpoena); Filing No. 117, p. 19 (Defendants' brief in opp. to subpoena) (asserting no additional records naming Kiewit).

---

[22]West was the 30(b)(6) representative for the corporate Defendants' depositions.  As such, West was designated to testify as to "[a]ny and all representations involving Peter Kiewit Sons', Inc. to Wall Street Equity Group, Inc.'s potential clients . . . [and] [a]ll use by Wall Street Equity Group, Inc. of the name 'Peter Kiewit Sons', Inc.,' 'Kiewit,' . . . or any similar name which is affiliated with the Plaintiff."  Filing No. 62 (Notice to take 30(b)(6) Deposition of Wall Street Equity Group, Inc.)

Defendants and their counsel called witness and Defendants' former employee, Tara Bethel, a liar.[23]  Bethel provided an affidavit, submitted to the court by the Plaintiff, which stated that while she worked for WSE, she "observed at least one-hundred (100) instances in which a WSE employee would represent to a prospective client-business owner that Peter Kiewit Sons' Inc. was a ready, willing, and interested buyer client-business owner's business.  These representations were made both orally over the telephone and in written follow-up letters."  Filing No. 119-1.  In the end, the forensic examination, which West so vehemently resisted and attempted to delay, revealed Bethel was telling the truth.

But West, WSE Vice President R.J. Rios, and WSE group employee Steven Blum did provide false statements to this court.   The Continuum examination revealed additional documents comparable to the Hdlaky and Waterfront Marine letters and naming Kiewit as a potential buyer.  The examination also revealed email correspondence that was purportedly from Defendant West which mentions Kiewit as a potential buyer of companies.   The evidence also establishes that Bertke possessed back-up copies of Defendants' electronic files at the time West stated he did not.   The Rios affidavit submitted of record stated that "[d]uring the time [Tara] Bethel worked for WSE, the name 'Kiewit' was never mentioned in the office where Bethel worked, verbally or in writing."   Filing No. 121-3, ¶5.  Blum submitted an identical affidavit.   Filing No. 121-4, ¶5.  The assertions made by West, Rios, and Blum are directly contradicted by the documents obtained as a result of the forensic examination, to include emails naming Kiewit as a potential buyer, sent under Rios'

---

[23]During the course of hearings before the undersigned, Defense counsel has also muttered "that's a lie," or words to that effect, several times in response to statements made by Plaintiff's counsel.  Despite the hostile and often volatile environment of the court proceedings, I have not found any instance where Plaintiff or its counsel misrepresented the record or the facts to this court.

signature by Bethel, and of which Rios received a copy. See, e.g., Filing No. 182-1, pp. 3, 6, 9 &12.

Defendants appear surprisingly unconcerned that they misrepresented a large portion of the factual basis upon which their initial defense of this lawsuit relied.[24]   Rather than initiating a contrite dialogue with Plaintiff's counsel and this court to fix the mess they caused, the Defendants waited for the Plaintiff to report the problem, and Defendants then attempted to explain away their patently false and repeated statements from multiple sources by stating they were simply "mistaken."  Defendants have seamlessly changed their defense from "there were only 2 letters total"  to "there were only 23 letters over five years," Filing No. 259, 257:8-9.

Defendants also assert they could not have known about the additional letters mentioning Kiewit because it was their practice to delete solicitations that did not produce business for them.  This claim is simply not believable.  Defendants' search of their electronic files to provide discovery responses was woefully inadequate.  And having heard and observed Defendant West testify on several occasions, the undersigned magistrate judge finds Defendant West is not a credible witness, and his claim that he cannot remember communicating with potential clients regarding Kiewit is not credible.  The forensic examination produced several copies of letters bearing West's signature and indicating he

---

[24]  Defendants asserted just the contacts with Hdlaky and Waterfront Marine existed and, presumably because Defendants' did not profit from those contacts, Plaintiff could not prove any damages.  In fact, Defendants even moved for sanctions on the issue, calling the lawsuit frivolous based, in part, on these incorrect factual assertions.  While the court need not decide the underlying merits of the lawsuit, Defendants' motion for sanctions against the Plaintiff based on Defendants' false representations to this court was clearly improper, bordering on unconscionable.

had spoken with the individuals personally regarding the potential sales of their companies to Kiewit.  See, e.g., Filing No. 182-1, pp. 39, 48, 53, 55, 60.  West was presented as a 30(b)(6) witness, yet there is no indication he diligently prepared for those depositions, and he was quick to claim he did not have any first hand knowledge of any list of WSE's and WSG's clients.  The lists were, at least at one time, in the Defendants' possession.  Filing No. 239, 112:7-115:5.  West claims he knows nothing about computers, but admits he dumped Server 1 in the trash, after the discovery battles had erupted and with no notice to the Plaintiff or this court, upon concluding the motherboard was "fried."  Simply put, West was not a believable witness and his pattern of dishonesty under oath, and cavalier attitude while doing so, is a "direct affront to the court."  Chrysler Corp., 186 F.3d at 1021.

## 2.  **Electronic Discovery**

Once a party is involved in or reasonably anticipates litigation, several duties arise related to finding and preserving discoverable information.  These duties include:

- A party must suspend its routine document destruction policy and put a "litigation hold" in place;

- Counsel must become fully aware of client's retention policy and "architecture";

- Counsel must communicate with the "key players" to determine how information is stored;

- Counsel must reasonably monitor compliance with the "litigation hold" so that all sources of discoverable information are identified and searched; and

- Having identified all sources of relevant information, a party and its counsel are under a duty to retain that information and produce information responsive to the opposing party's requests.

Cache La Poudre Feeds, LLC v. Land O'Lakes, 244 F.R.D. 614, 625 (D. Colo. 2007)(citing Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431-433 (S.D.N.Y. 2004).

### a.    Equipment in Arthur Bertke's possession.

Plaintiff asserts Defendants intentionally moved electronic storage devices in order to prevent Bertke from responding to a subpoena issued by Plaintiff.  Plaintiff served its notice to issue a subpoena on Bertke on August 1, 2011.  The proposed subpoena commanded Bertke to produce:

> documents, electronically stored information, or objects and permit their inspection, copying, testing, or sampling of the material: copies of any and all electronically stored information, including, but not limited to, all backup data and/or tapes regarding accounts receivable, money paid for business valuations, financial statements, and any correspondence referencing Plaintiff or the word "Kiewit" for Wall Street Equity Group, Inc., Wall Street Group of Companies, Inc., Shepherd Friedman and Steven West for the time period January 1, 2008, to the present time.

Filing No. 73.

Defendants served a notice that they intended to object to the issuance of the subpoena and Plaintiff subsequently moved for a court order to issue the subpoena. Defendants objected stating that they did not have any records referencing "Kiewit" and further asserted by affidavit:

> All of the business records of Wall Street Group of Companies, Inc. and Wall Street Equity Group, Inc. are maintained in the offices of Wall Street Equity Group, Inc., and are not in the possession and/or control of any third party.

34

Filing No. 117-12, ¶3.

A second affidavit submitted by West swore that "WSE's landlord does not have and does not maintain a copy of the electronic files created by Defendants." Filing No. 115-16, ¶ 32.

These assertions were false. Defendants had placed copies of their electronic files in the possession of Bertke – WSE's landlord. Moreover, immediately after the undersigned authorized the issuance of the subpoena on Bertke, but before it was actually served on Bertke, West contacted Bertke and instructed him to return equipment containing Defendants' electronically stored information. Bertke did so and by the time he received the subpoena, he no longer possessed any responsive materials. Having learned of West's actions, Kiewit moved for sanctions.

West again asserted the false statements in his affidavits were mistakes and that he simply forgot Bertke possessed copies of Defendants' files. He also asserts his motivation in removing the equipment from Bertke's possession was to ensure its safety because he walked by the room where Bertke stored Defendants' files, noticed the usually locked door was ajar, and simultaneously remembered Bertke had the equipment. This allegedly prompted West to contact Bertke and ask for all of the equipment to make sure it was safely stored. Further, West asserted he had only a general knowledge that discovery in the suit was ongoing, but was not aware Bertke was going to be served a subpoena directing him to produce the exact equipment West commanded Bertke to return.

West's explanation for retrieving all computer drives from Bertke before a subpoena could be served is not credible, and his actions were in bad faith. Plaintiff initially noticed the subpoena of Bertke on August 1, 2011. The matter was contested, with briefs and

evidence submitted by both parties.  At the motion hearing, West testified that he was not fully aware of the discovery process because Defendants' main communication with their attorney came through Richard Calabria, the current President of WSE.   But West himself submitted an affidavit, filed on October 7, 2011, in support of Defendants' objection to issuing the Berktke subpoena.  West also testified as Defendants' 30(b)(6) witness, has testified at multiple hearings, and has submitted several affidavits in this case.  To suggest he was unaware of the discovery process, including the particulars involved in the dispute over the issuance of the subpoena to Bertke, is disingenuous.

Defendants removed the electronic storage devices from Bertke on the eve of the service of the court ordered subpoena and only produced the equipment after the undersigned ordered the Defendants to do so.[25]  The court finds Defendants' conduct with regard to the initial objection to the Bertke subpoena and the subsequent movement of the electronic storage devices to constitute bad faith.

### b.      Search for Electronically Stored Evidence.

Fed. R. Civ. P. 26(b)(2) addresses a party's duty in preserving and producing electronic data.

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the

---

[25]  West argues that he turned over the electronic files to his counsel prior to being ordered to do so, indicating he was acting in good faith.  Whatever his motivation for giving the electronic storage devices to counsel, I do not believe it was an act of "good faith" or in any way offsets his intentional disruption of the discovery process.

36

party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Fed. R. Civ. P. 26(b)(2)(B).

The federal rules further provide that a court may limit the frequency or extent of discovery if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Thus, unless the producing party can make a showing that the discovery requests at issue seek inaccessible information, or responding to those requests will be overly burdensome in light of other options available for obtaining the requested information, the producing party will bear the cost of production. See Rowe Entertainment, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 428 (S.D.N.Y. 2002); see also Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318 (S.D.N.Y. 2003)(cost-shifting should only be

considered when electronic discovery imposes an "undue burden or expense" on the responding party).

> [W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production). . . . [I]n the world of electronic data, thanks to search engines, any data that is retained in a machine readable format is typically accessible.

Zubulake, 217 F.R.D. at 318.

In this case, Plaintiff is seeking to require Defendants to pay for the costs associated with the forensic computer examination conducted by the representative from Continuum. Conversely, Defendants argue they were incapable of finding the letters and other communications discovered as a result of the forensic examination. Defendants' basis for their argument is two-fold: 1) Defendants argue they had Romano, their most "computer literate" employee, conduct a keyword search for "Kiewit" from her work station and that search revealed no letters or communications with potential clients containing the term "Kiewit;" and (2) the search conducted by Continuum took several weeks and Defendants could not have performed such an extensive search on their own.

Defendants cite to no authority stating they may meet their burden of showing the electronic discovery in this case was unduly burdensome and too costly to produce because the information was not disclosed through a keyword search at a computer work station. Although Romano, who performed the keyword search, testified she consulted with Bertke prior to performing the search, she is not a computer expert and has no formal training in computer sciences. Defendants have offered no evidence that they spoke with a forensic examiner or any other computer expert to even evaluate what the cost and burden of

38

thoroughly searching Server 2. Considering Defendants' very liberal policy of not keeping documents, consolidating their records in one location, or organizing their files, their efforts to locate relevant electronic files were woefully inadequate.

Defendants' argument that they were not capable of performing a search similar to Continuum's search is equally unpersuasive. Defendants focus on the amount of time it took Clyde to complete the imaging and search of their electronic equipment. However, the length of a search has very little to do with whether the requested data was accessible. Simply stating the Continuum analysis took a long time, and no one in the employ of Defendants could perform the search, does not meet the burden of showing the information was "inaccessible" for the purposes of discovery. See Zubulake, 217 F.R.D. at 320 (even "accessible" data may take "days" to actually access).

Thus, Defendants have not shown the documents were inaccessible. Further, by relying on an employee's simple key word search from her work station, the court finds Defendants did not conduct a good faith search for the electronically stored information. Accordingly, Defendants shall pay for Plaintiff's reasonable attorney's fees and the expenses associated with Continuum's forensic examination of Defendants' computer equipment, and for filing and litigating the motion to compel and all other motions and hearings associated with retrieving and searching Defendants' computer files.

**c.    Spoliation.**

Plaintiff alleges Defendants should be sanctioned for intentionally destroying evidence. "A spoliation-of-evidence sanction requires 'a finding of intentional destruction indicating a desire to suppress the truth.' " Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007)(quoting Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746 (8th Cir.

2004)). Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of witnesses in a particular case, and other factors." Morris v. Union Pac. R.R., 373 F.3d 896, 902 (8th Cir. 2004).  Where evidence has been intentionally destroyed to suppress the truth, one appropriate sanction is an adverse jury instruction regarding the contents of the destroyed evidence.  See Stevenson, 354 F.3d at 746-47.

Plaintiff alleges Defendant West intentionally destroyed evidence when he discarded Server 1 after it crashed in August or September of 2011.  West admits to disposing of Server 1, but alleges all of the information on Server 1 was preserved on a hard drive prior to the time it was discarded.  In support of this contention, West offered affidavits from Bertke with the following statements:

- Bertke copied the data from the black hard drive given to him by West in September 2011 on to another black hard drive on October 14, 2011.  Filing No. 174-1, ¶5.

- Bertke did not review the data on the black hard drives, but the amount of data on those drives is consistent with being all the data from Defendants' original server [Server 1]. Filing No. 174-1, ¶6.

- Bertke examined a Black Western Digital My Passport external USB hard drive, serial number WX81A5116889 and discovered that it contains 130,423 files in 6,031 folders,(filing no. 229-1, ¶4), with the earliest file dated July 29, 1998, and the latest file dated December 31, 2010.  Filing No. 229-1, ¶5.

- Bertke's findings on the Black Western Digital My Passport external USB hard drive are consistent with what he would expect to find on a backup of the server put in service for Defendants on September 20, 2010 [Server 1].  Filing No. 229-1, ¶6.

- All files dated after December 31, 2010 were moved to a new server put in service in August 2011 [Server 2]. Filing No. 229-1, ¶7.

40

- The server put in service on September 20 , 2010 [Server 1] contained all the remaining files; the files on the black hard drives appear to be those files. Filing No. 229-1, ¶8.

West instructed Romano to create a back-up copy, presumably on one of the black hard drives that was subjected to the forensic examination, of all the files on Server 1 prior to its disposal. Filing No. 259, 175:14-25 & Filing No. 207, 91:13-92:2. Thus, West argues that all of the files on the crashed server had been preserved. West further argues that he knows very little about computers and despite being in the middle of contentious litigation, did not think keeping the "fried" server was necessary. West states that he did not dispose of Server 1 with the intent to destroy evidence.

Although Romano may be the most "computer literate" person employed by Defendants, she undoubtedly lacks the experience or training to ensure that all files and other information from Server 1 were preserved in the transfer. And Bertke provided credible evidence, but his testimony regarding what was transferred to a hard drive from Server 1 was qualified; Bertke states the information it contained was what he "would expect to find" on the backup of Server 1 and the amount of information was "consistent" with being all of the data from Server 1. He could not unequivocally state that all of the data and files were transferred before Server 1 was discarded. Finally, the Plaintiff presented evidence of one letter sent by Defendants containing the term "Kiewit" that was not located during the forensic examination conducted by Continuum – the June 25, 2008 letter addressed to Randy Sutton at Waterfront Marine. Filing No. 259, 175:14-25. This lends support to Plaintiff's claim that evidence was destroyed, with no backup copy, when West tossed Server 1 in a dumpster.

41

West disposed of Server 1 in the middle of this litigation, and shortly after he was on notice of Plaintiff's intention to seek and review Defendants' electronic records and equipment. Defendants claim they experienced numerous computer problems over time and have been through several servers,[26] but this argument misses the point. The Plaintiff is not complaining that Defendants replaced a server: It is stating West intentionally tossed out the "fried" Server in the middle of litigation without first taking reasonable measures to determine whether all the information was preserved or forensically examined.

West's false affidavits and false deposition testimony, particularly combined with the false affidavits submitted by Rios and Blum (see filing nos. 121-3, ¶¶ 4-5; 121-4, ¶¶ 4-5), West's conduct of throwing a computer server in a dumpster while motions for discovery of electronic information were pending, and his removal of computer hard drives and servers from Bertke's possession immediately after the court ruled that Bertke could be subpoenaed to produce these drives, provide ample evidence that Defendants intentionally submitted false evidence and testimony in bad faith, committed fraud on this court, and intentionally destroyed evidence with a desire to suppress the truth in this case.[27] Such conduct warrants

───────────────

[26]   This is akin to arguing that they were following standard operating procedures in discarding an allegedly malfunctioning server. However, like document retention policies, even if this is acceptable conduct outside of the context of litigation, Defendants cannot hide behind it once litigation has started and they are on notice of Plaintiffs' intention to seek production of the equipment. See, e.g., Lewy v. Remington Arms Co. Inc, 836 F.2d 1104, 1112 (8th Cir. 1988)("a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous retention policy.")

[27]The court also reviewed West's deposition testimony, such as it was. See Filing Nos. 248-6, -7, -8, and -9. On many occasions, it was difficult to determine who was testifying: West or Defendants' counsel. But one thing was clear--West was evasive and uncooperative throughout the deposition.

42

the imposition of an adverse jury instruction.  See Stevenson, 354 F.3d at 750 (finding the power to give an adverse jury instruction is support by Fed. R. Civ. P. 37 or the "court's inherent power").   Specifically, the defendants's discovery abuse warrants instructing the jury that it may assume that the contents of the discarded server would have been adverse, or detrimental, to Defendants' case.

CONCLUSION

As summarized below, Defendants, and particularly Defendant West, engaged in a pattern of sanctionable conduct.

- Defendants argued passionately and unequivocally that no more than two letters were sent to potential clients mentioning "Kiewit." Defendants made these representations under oath, in answers to written discovery, in briefs, and at oral argument before the undersigned.  These representations were false.

- West told the court that Arthur Bertke did not possess any of Defendants' electronic files.  This representation was false.

- Defendants submitted affidavits from two of its employees stating the name "Kiewit" was never mentioned in writing while Tara Bethel was employed by Defendants. This representation was false.

- Defendant West tossed a computer server in a dumpster the same month Defendants received notice that Plaintiff was seeking Defendants' electronic records.

- Defendants' only search of its electronic files was a key word search conducted by an employee with no professional training in information services and who admitted she is not a computer expert.

West attempts to explain away these multiple misrepresentations and improper actions as the "mistakes" of a computer illiterate.[28] This explanation is neither satisfactory nor believable. In fact, the more West testified regarding these matters, the less credible he appeared. One false affidavit statement may be a mistake. A series of misrepresentations, particularly in the context of the pattern and timing of the events in this case, is conduct committed in bad faith to perpetuate fraud on the court. Severe sanctions are warranted.

IT IS ORDERED:

1) Plaintiff's motion for leave to file a reply brief, (filing no. 255), is granted and the court reviewed and considered the proposed reply brief, (filing no. 255-1), as well as Defendants' responsive brief, (filing no. 256).

2) Defendants' motion to amend its answer, (filing no. 179), is denied.

3) Defendants' motion for a protective order, (filing no. 158), is granted in part and denied in part as set forth in the body of this Memorandum and Order. A protective order shall be entered separately by this court.

4) Plaintiff's motion for sanctions, (filing no. 135), is granted in part and denied in part as set forth below:

   a. Plaintiff's request for attorneys' fees and costs associated with its Motion for Issuance of Subpoena on Arthur Bertke; Plaintiff's request for costs associated with the forensic examination of Plaintiff's electronic equipment; Plaintiff's request for attorney's fees and costs associated with Plaintiff's motion to compel, and associated motions and hearings; and its motion for sanctions, are granted. Plaintiff shall submit an itemized billing statement of fees and expenses associated

---

[28] The court finds it extremely ironic that Defendants so readily characterize Tara Bethel as a liar based on one affidavit she submitted when her affidavit actually led to the discovery of responsive documents, while Defendants have submitted multiple patently false affidavits to this court which Defendants simply characterize as "mistakes."

with the above referenced motions and the Continuum forensic examination of Defendants' electronic equipment, on or before June 1, 2012, in support of its motion for sanctions.  Plaintiff shall refer to NECivR 54.4 for guidance in preparing the statement.

c.      Plaintiff's motion for sanctions is denied in all other respects.

d.      The pretrial conference and trial are continued pending further order of the court.  A telephonic status conference before the undersigned magistrate judge will be held on September 5, 2012 at 10:00 a.m. (CDT) to discuss further case progression.  Counsel for plaintiff shall place or arrange the call.

IT IS FURTHER HEREBY RECOMMENDED to the Honorable John M. Gerrard that an adverse jury instruction be given at trial, with the jury instructed as follows:

You may, but are not required to, assume that information stored on the discarded server [Server 1] would have been adverse, harmful, or detrimental to the defendants' claims and defenses.

DATED this 18th day of May, 2012.

BY THE COURT:

*s/ Cheryl R. Zwart*_____
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.