IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PETER KIEWIT SONS', INC., | | |
| Plaintiff, | | 8:10-CV-365 |
| vs. | | |
| WALL STREET EQUITY GROUP, INC., ET AL., | | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Defendants. | | |

This matter is before the Court for findings of fact and conclusions of law based upon the defendants' default (filing 385) and a hearing held pursuant to Fed. R. Civ. P. 55(b)(2)(B) to determine the amount of damages. For the reasons explained below, the Court awards damages to the plaintiff in the amount of $913,099.46.

## I. BACKGROUND

The plaintiff, Peter Kiewit Sons', Inc. (Kiewit), is a construction and mining company, and the owner of the service mark "Kiewit," Registration No. 2,569,239. Filing 126 at 1. The primary defendant is Steven S. West,[1] a Florida businessman. Filing 126 at 1-2. Shepherd Friedman, the other individual defendant, is a business associate of West, and the corporate defendants Wall Street Equity Group, Inc. and Wall Street Group of Companies, Inc. are businesses controlled by Friedman and West. Filing 126 at 2. (Primarily West, as the evidence explained below will show.) Generally speaking, to the extent relevant here, the Wall Street entities claim to help small business[2] owners sell their businesses to larger companies.

---

[1] According to the record, West's legal name remains Steven Watstein. E22 at 87-88. To be clear, just in case it should come up: West and Watstein are the same person, and this Court's judgment is directed at West regardless of what name he is using.

[2] The Court is using the term "small business" loosely here: the businesses targeted here generally seem to have had, at least arguably, multi-million dollar valuations. (Which makes sense, if the defendants' sales pitch was to seem credible, and if the defendants were to make any money from them.) But they also generally seem to have been closely-held and small for the relevant industry, construction. *See generally*, 13 C.F.R. § 121.201. What really matters, for purposes of this case, is their size relative to Kiewit.

As part of its operations, Kiewit from time to time acquires other companies in the United States or other parts of the world. Filing 417 at 8-9. That involves investigating and evaluating the potential acquisition. Filing 417 at 9. The first and only actual business conducted between Kiewit and the defendants occurred in the process of such an acquisition in 2008. Filing 417 at 10, 15. Jett Industries, the company being acquired, had responded to an advertisement placed by one of West's businesses (it's not clear which one) and West's company had initiated contact with Kiewit. Filing 417 at 11. Scott Schmidt, Kiewit's vice-president of strategy and development, concluded after speaking with them that West's company did not have any actual expertise in business acquisition, so Kiewit worked directly with Jett Industries to complete the sale. Filing 417 at 7, 12-13. West only appeared at the closing, apparently to collect his fee. Filing 417 at 13-14.

Later that year, a small business owner from Virginia contacted Kiewit and asked if Kiewit was interesting in buying his business. Filing 417 at 17. He explained to Schmidt

> that he'd been contacted by Mr. West and that he was told Mr. West performed valuations of companies and that his valuation was the only one that Kiewit would accept and that Mr. West had a Kiewit executive in his board room waiting to talk to [the small business owner] as soon as [he] signed an engagement letter to engage Mr. West's firm to perform a valuation.

Filing 417 at 17. Wall Street Group sent the small business owner a letter, signed by Friedman, claiming to be the "leading private investment bank in America," and suggesting that based on a "'back of the envelope' evaluation" the business could be sold for approximately $20 million dollars. Filing 9 at 10. The letter specifically mentioned that the enclosed information included "[b]ackground on the buyer, Kiewit." Filing 9 at 10. The letter sought to schedule an interview, after which—if Wall Street Group chose to represent the business—the business would be expected to pay $20,000 to $30,000 to create an "appraisal and business profile." Filing 9 at 11.

Kiewit's in-house counsel sent Friedman a letter demanding that his company cease use of the Kiewit mark. Filing 9 at 12. In response, Kiewit received a letter from the "Office of General Counsel" of "West Acquisitions and Investment Groups, Inc.", denying that any of its affiliated entities had held themselves out as representing Kiewit. Filing 9 at 13. Kiewit considered the matter closed. Filing 417 at 22.

But in April 2010, Schmidt was contacted by the owner of a small construction company from Wyoming, who said he'd been contacted by

another Wall Street entity, and been told "'that they had a Kiewit executive sitting in their board room and they were ready to talk to me.'" Filing 417 at 23. That business also received a letter that was signed by West on behalf of Wall Street Equity, but was in all other respects substantially the same as the letter sent to the Virginia business. Filing 9 at 5-6. They also received an email from a @wallstreetmergers.com email address directing them to www.kiewit.com "[t]o learn more about the buyer." Filing 9 at 4.

In response, Kiewit filed this lawsuit. Filing 1. A protracted and ugly discovery process ensued that is well chronicled on the Court's docket. Generally summarized, the defendants engaged in evasion and outright deception in attempting to prevent Kiewit from discovering the scope of their activities. As reflected in the Magistrate Judge's findings, recommendation and order of May 18, 2012 (filing 263), West claimed to have only used Kiewit's mark on two occasions, and claimed to have no documentation suggesting otherwise, only to be caught lying. *See, e.g.*, filing 263 at 29-33; *see also* filing 384 (adopting Magistrate Judge's findings regarding discovery abuses). Kiewit eventually obtained a number of effectively-identical letters using the Kiewit mark to solicit different businesses, and client lists and records suggesting that more letters had been sent that remained undiscovered.

What is known about the scope of West's activities, and what remains unknown, will be discussed in more detail below as it specifically relates to the calculation of damages. For background purposes, it suffices to state a couple of conclusions that the Court finds from the evidence. First, describing the defendants' conduct as "West's activities" is purposeful: West planned and instigated all the misconduct at issue in this case. Second, the scope of West's activities involving the Kiewit mark is widespread: it goes far beyond the instances that West admitted to, and far beyond that which is affirmatively shown by the evidence Kiewit was able to uncover in spite of West's attempts to conceal or destroy it. It involved dozens and perhaps hundreds of solicitations, and at least hundreds of thousands of dollars in fees paid by unsuspecting businesses.

The Magistrate Judge recommended that default be entered against all the defendants "as a sanction for severe and continuing discovery abuses," and the Court adopted that recommendation. Filing 376 at 1; filing 384. A hearing was then held, pursuant to Fed. R. Civ. P. 55(b)(2), on the issue of damages—both the amount of damages to be awarded, and the apportionment of those damages among the defendants.

But the entry of default does not end the Court's inquiry as to damages *or* liability. When a default judgment is entered, facts alleged in the complaint—except as to damages—may not be later contested. *Marshall v.*

*Baggett*, 616 F.3d 849, 852 (8th Cir. 2010); *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010). It remains for the Court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law. *Id.* Therefore, although the allegations of the plaintiff's complaint are admitted, *see id.*, it is still necessary for the Court to determine the plaintiff's damages based upon the evidence. *See,* Fed. R. Civ. P. 55(b)(2)(B); *Brown v. Kenron Aluminum & Glass Corp.*, 477 F.2d 526, 531 (8th Cir. 1973). And even before that, it is incumbent upon the Court to ensure that the unchallenged facts constitute a legitimate cause of action before entering final judgment. *Marshall*, 616 F.3d at 852-53. That will require the Court to discuss the necessary elements of each of the plaintiff's theories of relief.

## II. DISCUSSION—LIABILITY

Kiewit's complaint alleges three claims pursuant to different provisions of the Lanham Act, 15 U.S.C. § 1051 *et seq*., and four supplemental state law claims. For reasons that will become apparent, the Lanham Act claims are the most important, so the Court will start there.

### 1. LANHAM ACT

The Lanham Act, generally speaking, affords the holder of a trademark or service mark the right to control the quality of goods or services that are manufactured or sold using its service mark. *See Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 633-34 (8th Cir. 2006).[3] And the Lanham Act protects persons engaged in commerce against false advertisement and unfair competition. *United Indus. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

There are three specific provisions at issue here. First, a defendant may be liable for using a mark in commerce, in connection with goods or services, in a way that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" 15 U.S.C. § 1125(a)(1)(A). Second, a defendant may be liable if it, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). And finally,

---

[3] Kiewit holds a service mark, but while the distinction between a trademark and a service mark may be relevant for registration purposes, it is not particularly relevant for purposes of an infringement analysis. *See id.* at 633.

> [s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

Kiewit's complaint asserts violations of all three provisions. Filing 126 at 4-7. The factual allegations of Kiewit's operative complaint, however, are relatively thin—the complaint does not, in fact, allege what the defendants are supposed to have actually done. But Fed. R. Civ. P. 55(b)(2) permits the Court, after an entry of default, to conduct a hearing not only to determine the amount of damages, but to "establish the truth of any allegation by evidence" and "investigate any other matter." As a result, for purposes of determining whether a cause of action is legitimate, Kiewit is entitled to both the admitted allegations of the complaint and all reasonable inferences from the evidence admitted at the hearing. See *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

### (a) 15 U.S.C. § 1125(a)(1)(A): Mark Infringement

Mark infringement requires proof that the plaintiff has ownership or rights in the mark and that the defendant has used the mark in commerce, in connection with goods or services, in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011).

The term "used in commerce" means the bona fide use of a mark in the ordinary course of trade, and a mark is deemed to be in use in commerce when it is used or displayed in the sale or advertising of services and the services are rendered in commerce. 15 U.S.C. § 1127(2); *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 470 (8th Cir. 2011). The defendants plainly used Kiewit's mark in commerce here, in connection with goods or services: the mark was repeatedly employed in solicitations for the defendants' commercial valuation and brokerage services.

In evaluating a likelihood of confusion between a mark and an allegedly-infringing mark, courts generally consider such factors as the strength of the owner's mark, the similarity between the marks, the degree to which the allegedly-infringing service competes with the mark-owner's

service, the alleged infringer's intent to confuse the public, and evidence of actual confusion. *See Devon Park*, 634 F.3d at 1009. No one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases. *Id.*

Of course, in this case, the degree of similarity is not a relevant criterion, because only a single mark is at issue. *See Masters*, 631 F.3d at 473. And while the defendants were not in direct competition with Kiewit, the pleadings and record amply demonstrate the defendants' intent to confuse others. Confusion is relevant when it influences a purchasing decision. *See Mid-State*, 466 F.3d at 634. The defendants emphasized their purported relationship with Kiewit, making the possibility of a Kiewit purchase an important reason to purchase the defendants' services. And Kiewit was contacted by persons who had actually been misled, providing evidence of actual confusion. In sum, the pleadings and evidence show that the defendants' unauthorized use of the Kiewit mark was misleading, and was likely to (and actually did) cause confusion about Kiewit's "sponsorship" of the defendants' services. *Compare Masters*, 631 F.3d at 474. Kiewit has established its mark infringement claim.

(b) 15 U.S.C. § 1125(a)(1)(B): False Advertising

To establish a Lanham Act false advertising claim, a plaintiff must prove (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Buetow v. A.L.S. Enters.*, 650 F.3d 1178, 1182 (8th Cir. 2011); *Clorox Co.*, 140 F.3d at 1180. The false statement necessary to establish such a violation usually falls into one of two categories: a commercial claim that is literally false as a factual matter; or a claim that may be literally true or ambiguous but which implicitly conveys a false impression, is misleading in context, or is likely to deceive consumers. *Clorox Co.*, 140 F.3d at 1180.

For purposes of this analysis, the Court finds that Kiewit has at least proved that the defendants made statements that conveyed a false impression. The defendants' solicitations distinctly gave the impression that Kiewit was already an interested purchaser that had engaged the defendants

to broker a sale.⁴ The defendants' claim that Kiewit was a potential buyer both conveyed the implied message and deceived its recipients. *See id.* at 1182-83.

But there are other problems with Kiewit's false advertising claim. First, to be "commercial advertising or promotion," a defendant's statements must be disseminated sufficiently to the relevant purchasing public within an industry. *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996)). The required level of circulation and the relevant purchasing public will vary according to the specifics of the industry. *Id.* The speech must target a class or category of purchasers or potential purchasers, not merely particular individuals. *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 19-20 (1st Cir. 2003). Although the Act is not limited to traditional advertising campaigns, and may encompass more informal types of promotion, it cannot be stretched so broadly as to encompass all forms of commercial speech. *See*, *Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 521-22 (7th Cir. 2012); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999); *Seven-Up Co.*, 86 F.3d at 1384. The touchstone is whether a defendant's representations were part of an organized attempt to penetrate the relevant market. *Fashion Boutique*, 314 F.3d at 57. For instance, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not. *Neuros Co.,* 698 F.3d at 521.

Missing for Kiewit are allegations or evidence showing such widespread dissemination. To be sure, the defendants' promotional efforts were extensive. But each of the letters in evidence that mentions Kiewit makes reference to a previous telephone call, meaning that the letters were individual follow-ups to previous contact with potential customers. And the hearing testimony suggested that as well. Filing 417 at 44. There may have been a lot of letters, and they may have been form letters, but they do not suggest a concerted effort to penetrate a marketplace. *See Fashion Boutique*, 314 F.3d at 58 (collecting cases).

The other problem with Kiewit's claim will require a bit more explanation, but can generally be labeled as standing. When the case was filed—and, in fact, when it was submitted—there was a circuit split on

---

⁴ The evidence suggests that in conversation, the defendants' representatives were less ambiguous than the letters that are in the record. But there is substantial doubt about whether such private assurances would satisfy the "commercial advertisement" element of the claim, as discussed below. So, the Court is limited to the letters on this issue.

standing to bring a claim under the Lanham Act. *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, ___ F.3d ___, 2014 WL 3882886, at *5 (8th Cir. Aug. 8, 2014). And the Eighth Circuit had held that for a false statement to be actionable under the Lanham Act, it must be commercial speech that was made by a competitor of the plaintiff. *Id.* (citing *Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 871 (8th Cir. 2005)). It is readily apparent that the defendants were not commercial competitors of Kiewit. So, when this case was submitted to the Court, this claim was DOA.

But since then, the Supreme Court has administered CPR. In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014), the Court expressly rejected the requirement that challenged commercial speech be made by a competitor. *See Syngenta*, 2014 WL 3882886, at *5. Instead, the Court explained that a plaintiff's right to sue under a particular statute depends on whether the plaintiff comes within the "zone of interests" protected by the law involved, and that the statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. *Lexmark*, 134 S. Ct. at 1387-88, 1390. The Court held that to come within the zone of interests for false advertising under the Lanham Act, the plaintiff must allege an injury to a commercial interest in reputation or sales. *Id.* at 1390. And to satisfy the proximate cause requirement, the plaintiff must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising, "and that that occurs *when deception of consumers causes them to withhold trade from the plaintiff.*" *Id.* at 1391 (emphasis supplied).[5]

Kiewit's resuscitated false advertising claim is, therefore, still short-lived. It is arguably possible to get from the defendants' false claim about an association with Kiewit to a reputational injury to Kiewit, by virtue of associating Kiewit with disreputable defendants. But the defendants' "customers" are unlikely to be Kiewit's customers, and it is difficult to imagine how the defendants' false representations—even if they reflected poorly on Kiewit—could result in an actual commercial injury to Kiewit capable of clearing the bar set by the Supreme Court in *Lexmark*. Kiewit asserted a legal conclusion of injury from false advertising, but no facts

---

[5] The Supreme Court's holding was specifically phrased as requiring "a plaintiff suing under § 1125(a)" to show a commercial injury, *Lexmark*, 134 S. Ct. at 1391, raising a question as to whether the standing requirements the Court applied to a false advertising claim brought pursuant to § 1125(a)(1)(B) might also apply to a mark infringement claim brought pursuant to § 1125(a)(1)(A). But the rest of the Court's reasoning is particular to false advertising claims, and there is no sound basis to imply a sea change in trademark infringement law from an ambiguous citation in *Lexmark*.

demonstrating such a claim. *See Ahmed v. Hosting.com*, ___ F. Supp. 2d ___, 2014 WL 2925292, at *6-7 (D. Mass. June 27, 2014).

(c) 15 U.S.C. § 1125(c): Dilution by Tarnishment

Federal law allows the owner of a famous mark to enjoin a person from using a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark. *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 111 (2d Cir. 2010). The cause of action is intended to prevent the power and value of the mark from being whittled away through unauthorized use by others. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 167 (4th Cir. 2012). Only dilution by tarnishment is at issue here.

To prevail on a dilution claim, the plaintiff must show that it owns a famous mark, that the defendant is using a mark in commerce that dilutes the famous mark, that the defendant began using the mark after the plaintiff's became famous, and that the defendant's use is likely to cause dilution. *Rosetta Stone*, 676 F.3d at 168; *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012). Dilution by tarnishment is an association, arising from the similarity between a mark or trade name and a famous mark, that harms the reputation of the famous mark. 15 U.S.C. § 1125(c)(2)(C); *Rosetta Stone*, 676 F.3d at 167; *Coach*, 668 F.3d at 1372; *Tiffany*, 600 F.3d at 111. It generally arises when the plaintiff's mark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. *Tiffany*, 600 F.3d at 111. And the plaintiff has a right to injunctive relief "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

Kiewit's evidence and allegations are sufficient to at least establish a prima facie case of dilution by tarnishment. (Damages are another question.) The allegation that Kiewit's mark is famous is admitted. The defendants used the plaintiff's mark to promote their own services in what could fairly be described, from the perspective of their customers, as a scam. Because actual economic injury is expressly not required, the reputational injury of being seen as complicit in such a scheme is sufficient, for purposes of liability at least, to establish Kiewit's claim for relief.

2. STATE LAW CLAIMS

Kiewit's supplemental state law claims are common law trademark infringement; common law unfair competition; violation of the Nebraska Uniform Deceptive Trade Practices Act (UDTPA), Neb. Rev. Stat. § 87-301 *et seq.*; and violation of the Nebraska Consumer Protection Act (CPA), Neb. Rev.

Stat. § 59-1601 *et seq*. These claims will require less discussion, in large part because many of them are coextensive with Kiewit's Lanham Act claims.

To begin with, a claim for mark infringement under Nebraska common law is the same as under the Lanham Act. *See*, *Two Men and a Truck/Int'l, Inc. v. Thomas*, 908 F. Supp. 2d 1029, 1036-37 (D. Neb. 2012); *ADT Sec. Servs., Inc. v. A/C Sec. Sys., Inc.*, 736 N.W.2d 737, 763-67 (Neb. Ct. App. 2007); *see also* Neb. Rev. Stat. § 87-127. A claim for common law unfair competition is substantially identical. *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 483 (8th Cir. 1967).

Under the UDTPA, a person engages in a deceptive trade practice when, in the course of business, he causes a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, or causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with another. *See*, Neb. Rev. Stat. § 87-302; *Prime Home Care, LLC v. Pathways to Compassion, LLC*, 809 N.W.2d 751, 764 (Neb. 2012); *Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 591-92 (Neb. 2008); *Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243, 247 (Neb. Ct. App. 2007). That claim is, on these facts, substantially coextensive with Kiewit's federal mark infringement claim. *See Prime Home Care*, 809 N.W.2d at 764.

For the same reasons explained above with respect to Kiewit's federal mark infringement claim, the Court finds that Kiewit has sufficiently established its claims for common law infringement, common law unfair competition, and violation of the UDTPA. The CPA, however, has another requirement, that Kiewit does not meet. Even assuming that Kiewit has shown that the defendants engaged in conduct prohibited by the CPA, the ambit of that statute is limited to "unfair or deceptive acts or practices that affect the public interest." *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 141 (Neb. 2000); *see also*, *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 12 (Neb. 2008); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 36 (Neb. 2004). The CPA is not available to address a private wrong where the public interest is unaffected. *Nelson*, 605 N.W.2d at 142; *see*, *Eicher*, 748 N.W.2d at 12; *Arthur*, 676 N.W.2d at 37. Specifically, the conduct at issue must directly or indirectly affect the people of Nebraska. *Arthur*, 676 N.W.2d at 37-38.

And that is where Kiewit's proof fails, because there is nothing to suggest that the defendants reached into Nebraska with their solicitations, or that if they did, it was more than an isolated transaction. *Compare Nelson*, 605 N.W.2d 136. Kiewit alleged that the defendants "supply advertisements containing representations which are likely to deceive the general public," filing 126 at 9, but neither alleged nor proved that any of that occurred in Nebraska—and a CPA claim requires a showing that not just one, but many

- 10 -

Nebraska citizens are affected by a defendant's practices. *See*, *Eicher*, 748 N.W.2d at 12; *Arthur*, 676 N.W.2d at 38. Kiewit has made no such showing.

### III. DISCUSSION—DAMAGES

To summarize: Kiewit's causes of action are established with respect to mark infringement and dilution by tarnishment under the Lanham Act, common law infringement and unfair competition, and violation of the UDTPA. Three different aspects of damages require discussion: compensatory damages, costs and attorney fees, and injunctive relief. And then, the Court must determine whether to pierce the corporate veil and find the individual defendants liable for the award.

### 1. COMPENSATORY DAMAGES

As with liability, it is helpful to begin the discussion of damages with the Lanham Act. For trademark infringement, a plaintiff shall be entitled to recover the defendant's profits, any damages sustained by the plaintiff, and the costs of the action. 15 U.S.C. § 1117(a). An accounting of profits may be based upon unjust enrichment, damages, or deterrence of a willful infringer. *Masters*, 631 F.3d at 471.[6] Disgorgement exists to deter would-be infringers and to safeguard against unjust enrichment. *Id.* at 473. Proof of actual confusion on the part of consumers is not required in a case of this kind. *Id.* at 473-74. And the absence of actual damages does not preclude an award of defendant's profits. *Id.* at 474-75. In assessing damages the Court may also

> enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a)(3).

As suggested above, there is little basis in this case to conclude that Kiewit has suffered actual economic losses as a result of the defendants'

---

[6] The Eighth Circuit has noted a circuit split on whether a Lanham Act plaintiff must prove willful infringement to be eligible for money damages. *Id.* at 472 n.2. Even assuming that willful infringement is necessary, the Court finds ample evidence of willfulness in this case. The defendants were told not to use the Kiewit mark, and continued to do so anyway. And there is obviously no basis to conclude that they employed the mark accidentally.

conduct. And that also means that the treble damages provision of 15 U.S.C. § 1117(a)(3) is off the table: awarding three times the damages that the plaintiff can actually prove presupposes that the plaintiff can prove some damages. *See, Thompson v. Haynes*, 305 F.3d 1369, 1380 (Fed. Cir. 2002); *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994); *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975); *Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*, 497 F. Supp. 947, 961 (S.D.N.Y. 1980). Under § 1117(a)(3), "damages" are to be treated separately from "profits." *Thompson*, 305 F.3d at 1380.

But the Court may enter judgment for an amount that the Court finds to be just, in the event that recovery based on profits is inadequate or excessive. 15 U.S.C. § 1117(a)(3). Under this method, the benchmark is the likely benefit accruing to the defendant on account of its infringement. *Badger Meter*, 13 F.3d at 1157. The Court's primary function in making such an award is to make violations of the Lanham Act unprofitable to the infringing party. *See, BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1092 (7th Cir. 1994); *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982).

The Court finds an enhanced profit award to be appropriate in this case, based both on the Lanham Act and broader evidentiary principles. First, the Court finds that it would be unjust to limit its award solely to proven profits because that would reward the defendants for successfully concealing and destroying evidence. The Court has no doubt that the defendants' actual profit resulting from use of the Kiewit mark[7] was substantially greater than that for which direct evidence was obtained.

Second, it is well established that sanctions for spoliation of evidence are appropriate where there is an intentional destruction of evidence indicating a desire to suppress the truth. *See, Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013); *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012); *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). The Court finds that the defendants intentionally destroyed evidence in bad faith, indicating a desire to suppress the truth, and that Kiewit was prejudiced. *See Hallmark*, 703 F.3d at 460-61. To be clear: the Court is not imposing a monetary sanction for spoliation. But if this case had gone to a jury trial, an adverse inference instruction would have been

---

[7] To the extent that it might be unclear, the Court will make this specific finding: the Court finds that the defendants' profits from this business model were directly attributable to the use of the Kiewit mark. The business model was primarily based on collecting valuation fees, not brokering sales. The evidence before the Court from identified victims of the defendants' misrepresentations makes clear that the purported interest of Kiewit was determinative in persuading the victims to engage the defendants' services.

warranted. *See id.* Similarly, in this case, the Court infers that the evidence destroyed by the defendants would have been adverse or detrimental to them.

But the evidence that actually made it to court provides a starting point for calculating an award. There is direct evidence of $124,910 paid to the defendants based on solicitations known to have contained the Kiewit mark.[8] *See* E246.[9] Four other businesses are known to have paid the defendants based on such solicitations, but the amounts are unknown. E246. Kiewit suggests using the average amount paid to the defendants from businesses whose payments are known, filing 412 at 1, and the Court finds that to be a reasonable means for estimating those amounts. From that, Kiewit and the Court arrive at a subtotal of $174,874. Filing 412 at 2.

Kiewit suggests tripling that amount to, in part, recover profits that were likely accrued from unknown businesses that paid the defendants based on solicitations containing the Kiewit mark. Filing 412 at 2. That is reasonable almost to a fault: the Court finds that to be a conservative amount. The Court particularly notes the incomplete, but valuable records provided by Humberto Garcia, and attached to his deposition. E28, exhibits 1-3. Those records suggest substantially higher profits, both directly and indirectly. They suggest that at least dozens of businesses were contacted and paid the defendants, which is why they were on a "do not call" list circulated to the defendants' employees. The Court infers from the type of businesses on the list, and the consistency of the defendants' solicitations, that the Kiewit mark was used in many if not all of those sales. And the Court also infers that the Kiewit mark was used based on the destruction of any records which would show otherwise. Based on the number of businesses that apparently paid the defendants, and the likelihood that the Kiewit mark was used to solicit those payments, the Court finds that the defendants' profits were almost certainly greater than three times the amount paid by known customers of the defendants.[10] The Court will award $524,622 for disgorged

---

[8] The Court is aware that many of the letters at issue were written on letterhead bearing the names of companies besides the two corporate defendants in this case. For reasons that will be explained in more detail below, in the context of piercing the corporate veil, the Court does not find any purported corporate distinctions to be meaningful in this case. All of these solicitations are attributable to these defendants, regardless of what stationary they were printed on.

[9] The Court cites, for convenience, to Kiewit's summary of the evidence. But the Court has examined the record thoroughly and found that summary to be accurate. *See, generally,* E38-57; E237-44.

[10] The Court notes that it is a defendant's burden, in calculating profits, to prove any operating costs to be deducted from revenues realized during a period of trademark infringement. *Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793, 794 (8th Cir. 1986).

profits pursuant to § 1117(a)(1) and (3), as a remedy for the defendants' willful trademark infringement—and the Court stops there in no small part because Kiewit conservatively elected not to ask for more.[11] *See AARP v. Sycle*, 991 F. Supp. 2d 234 (D.D.C. 2014).

The method adopted by Nebraska courts to calculate damages for common law mark infringement is not just effectively, but purposefully identical to the Lanham Act. *ADT Sec. Servs.,* 736 N.W.2d at 763-67. Accordingly, the Court's award of disgorgement is the same for Kiewit's common law claims, which are coextensive theories of recovery for this purpose. But money damages are not available for Kiewit's dilution claim, or for violation of the UDTPA. Money damages are available for dilution by tarnishment only if, among other things, the defendant "willfully intended to harm the reputation of the famous mark." 15 U.S.C. § 1125(c)(5)(B)(ii). The defendants plainly intended to take advantage of Kiewit's reputation, but there is nothing to suggest they wished Kiewit any harm. And the UDTPA provides no private right of action for damages. *Reinbrecht,* 742 N.W.2d at 247; *see Consumer's Choice,* 755 N.W.2d at 587. So, the Court will award disgorgement of $524,622 for Kiewit's Lanham Act mark infringement claim and its common law claims.

## 2. COSTS AND ATTORNEY FEES

Under the Lanham Act, a prevailing plaintiff is entitled, subject to the principles of equity, to recover the costs of the action. 15 U.S.C. § 1117(a)(3). In addition, in "exceptional cases," a court may award reasonable attorney fees to the prevailing party. *Id.*; *see, B & B Hardware, Inc. v. Hargis Indus., Inc.*, 716 F.3d 1020, 1027 (8th Cir. 2013); *First Nat. Bank in Sioux Falls v. First Nat. Bank S.D.*, 679 F.3d 763, 771 (8th Cir. 2012); *Devon Park*, 634 F.3d at 1013. Where a defendant's conduct was willful and deliberate, a court may well determine that it is the type of exceptional case for which an award of attorney fees is appropriate. *First Nat. Bank*, 679 F.3d at 771; *Devon Park*, 634 F.3d at 1013.

This is such a case. The defendants willfully and deliberately used the Kiewit mark, after receiving a cease-and-desist letter and promising to comply with its demand. *See Devon Park*, 634 F.3d at 1013-14. The defendants plainly acted in bad faith, *see id.*, and have compounded that with

---

[11] Which is not to say that Kiewit was wrong to do so. Kiewit's good-faith, reasonable attempt to estimate an appropriate amount of damages is acknowledged and understood by the Court.

their conduct during litigation.[12] This is a profoundly exceptional case, and fees will be awarded. Kiewit has submitted evidence of $388,477.46 in costs and fees incurred. E247. The Court has examined the underlying records, E208-11, finds that amount to be fair and reasonable, and will enter its award accordingly.[13]

In addition, the UDTPA provides that costs shall be allowed to a prevailing party and that attorney fees may be allowed. Neb. Rev. Stat. § 87-303; *Consumer's Choice*, 755 N.W.2d at 593. The Court's award of costs and attorney fees is also supported by the UDTPA. *See id.*

### 3. INJUNCTIVE RELIEF

Kiewit's prayer for injunctive relief is straightforward. Injunctive relief is the preferred remedy in resolving trademark disputes. *Masters*, 631 F.3d at 471. To obtain a permanent injunction, a plaintiff must show (1) its actual success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest. *Devon Park*, 634 F.3d at 1012. Such proof is present here.

Kiewit's success on the merits was established above. Kiewit is presumed to face irreparable harm, because a likelihood of confusion has been established. *See id.* There is nothing to suggest that anyone would be harmed by an injunction, and preventing the defendants from misleading more people is clearly in the public interest. *See id.* at 1012-13. Therefore, the Court will enter a permanent injunction on the terms prayed for by Kiewit. Filing 126 at 10.

### 4. CORPORATE VEIL

Kiewit urges the Court to pierce the corporate veil of the Wall Street entities and hold West liable for the defendants' damages.[14] Kiewit suggests

---

[12] An award of attorney fees under Fed. R. Civ. P. 11 (or 28 U.S.C. § 1927 against the defendants' former counsel) might have been warranted even absent the Lanham Act's provisions.

[13] That amount includes $82,909.60 for fees and costs previously awarded by the Magistrate Judge. Filings 306 at 9 and 329 at 8. The Court's examination of the billing records indicates that the costs and attorney fees billed on the discovery matters that formed the basis of the Magistrate Judge's fee award are encompassed in the amounts for which Kiewit now seeks compensation. *Compare* E208-11 *with* filings 267 and 267-1.

[14] At the hearing, Kiewit essentially abandoned any claim against Friedman in an individual capacity. Filing 417 at 64. The Court agrees with Kiewit that Friedman testified truthfully at the hearing, and credits his testimony that his actions in connection with Kiewit's claims were performed in his capacity as an employee of the corporate defendants, and at the behest of West. The Court will not pierce the corporate veil to reach Friedman.

that Nebraska corporate law standards be applied to make that determination. Filing 406 at 30. Alternatively, Kiewit suggests that the law of Florida (where the corporate defendants are incorporated) is effectively the same, and can be applied interchangeably. Filing 406 at 31 n.3. But the law is a bit more complicated than that.

There is, in fact, significant disagreement about whether federal courts should borrow state law or apply federal common law when piercing a corporate veil to attach shareholder liability for a corporation's violation of a federal law. *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 728 n.3 (8th Cir. 2008) (citing *United States v. Bestfoods*, 524 U.S. 51, 63 n.9 (1998)). But in the Eighth Circuit, the federal common law standard is applied. *Id.* at 727-28. That standard requires the Court to determine whether (1) there was such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (2) adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations. *Id.* at 728.

When assessing the first prong to determine whether the shareholders and the corporation have failed to maintain their separate identities, the Court must consider the degree to which the corporate legal formalities have been maintained, and the degree to which individual and corporate assets and affairs have been commingled. *Id.* A non-exhaustive list of factors to consider includes

> (1) whether the corporation is operated as a separate entity; (2) the commingling of funds and other assets; (3) the failure to maintain adequate corporate records; (4) the nature of the corporation's ownership and control; (5) the availability and use of corporate assets, the absence of same, or under capitalization; (6) the use of the corporate form as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of corporate legal formalities and the failure to maintain an arm's-length relationship among related entities; (8) diversion of the corporate funds or assets to noncorporate purposes; and . . . (9) transfer or disposal of corporate assets without fair consideration.

*Id.* No one factor is determinative, and not all of these factors must be present. But nearly all of them are. Even according to West's testimony, he

_____

As a result, there is no basis for liability against Friedman, and the claims against him in his individual capacity will be dismissed.

was the sole shareholder and investor in all of his corporate entities. E34 at 15-19, 23. The companies had no bylaws and followed no corporate formalities. Filing 417 at 41-43; E34 at 76. Dozens of companies incorporated at West's direction were run from the same, relatively small office space, and were effectively operated as a single entity. Filing 417 at 40-44. There is evidence that West's personal expenses were paid from his companies, and that he deliberately structured his affairs so that he had no personal assets and was "judgment-proof." E34 at 98, 101-02, 106, 119; E35 at 162, 198, 209-15, 256-58, 266. There is evidence that an ownership dispute in Florida began when West directed the issuance of corporate stock to an associate specifically to evade a Kiewit judgment.[15] And, in fact, the Wall Street Group of Companies was dissolved 14 days after this suit was filed. E22 at 28. The "Wall Street Private Equity Group" was formed a couple of weeks after that. E22 at 31-32.

When assessing the second prong to determine whether adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations, the Court must consider causation and culpability. *Bolivar-Tees*, 551 F.3d at 729. A corporation's inability to pay its debt alone is not sufficient to support a finding of injustice—it is only when the shareholders disregard the separateness of the corporate identity and when that act of disregard causes the injustice or inequity or constitutes the fraud that the corporate veil may be pierced. *Id.* Additionally, the shareholders who will be held personally liable for the corporation's debt must share in some level of culpability for the injustice. *Id.*

The Court has little difficulty finding such evidence here. As explained above, the corporate structures at issue here seem to have been specifically intended and operated by their sole shareholder, West, to shield him from responsibility for his wrongdoing.[16] And there is no doubt that West does not

---

[15] To be sure, the testimony from hearings on the Florida matter was highly contentious. It is tempting to say that everyone is lying. But the Court need not resolve that matter for present purposes: if West's former associates are telling the truth, they rescued the companies from West treating them like his personal piggybank—meaning that they were West's alter ego when all the events underlying this case took place. And if West is telling the truth, he was the sole owner and proprietor of the companies, and his description of his management style also suggests that they were alter egos.

[16] As noted, there is information before the Court suggesting that the ownership of West's corporate entities may be disputed in Florida. But legal stock ownership is not dispositive in equity. Legal ownership, while relevant, does not preclude a finding of alter ego when control of the corporation is otherwise established. *See, Century Hotels v. United States*, 952 F.2d 107, 110-11 (5th Cir. 1992); *Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 343 (2d Cir. 1986); *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 729 (11th Cir. 1989); *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982); *Establissement*

just share culpability for the injustice—he is the sole shareholder of that as well. The Court will pierce the corporate veil and hold West responsible for the full measure of damages awarded in this case.[17]

Of course, as mentioned above, the award in this case is based not only on the Lanham Act, but Kiewit's state law claims. Federal courts hearing state law claims, under diversity or supplemental jurisdiction, apply the forum state's choice of law rules to select the applicable state substantive law. *McCoy v. Iberdrola Renewables, Inc.*, ___ F.3d ___, 2014 WL 3703945, at *8 (7th Cir. July 28, 2014); *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006); *Doty v. Sewall*, 908 F.3d 1053, 1063 (1st Cir. 1990). And under Nebraska's choice of law rules, when determining whether to pierce a corporate veil, the local law of the state of incorporation is applied. *Johnson v. Johnson*, 720 N.W.2d 20, 30 (Neb. 2006).

So, that leads back to Florida. And Florida law on veil-piercing is effectively the same as federal law: there must be proof that the corporate form was nonexistent and that the shareholders were in fact alter egos of the corporation, and the corporate form was used fraudulently or for an improper purpose, and that the fraudulent or improper use of the corporate form caused injury to the plaintiff. *Beltran v. Miraglia*, 125 So. 3d 855, 858 (Fla. Dist. Ct. App. 2013); *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008); *Priskie v. Missry*, 958 So. 2d 613, 614 (Fla. Dist. Ct. App. 2007). Based on the same factual findings as above, the Court finds that piercing the corporate veil to attach liability to West is also appropriate for Kiewit's state law claims.

## IV. PREJUDGMENT INTEREST

Kiewit also asks for prejudgment interest. But the Court can find no sound basis to award it.

---

*Tomis v. Shearson Hayden Stone, Inc.*, 459 F. Supp. 1355, 1366 n.13 (S.D.N.Y. 1978); *Medlock v. Medlock*, 642 N.W.2d 113, 126 (Neb. 2002). At all times relevant to this case, West had such control.

[17] The Court notes, should it become relevant, that a nonparty may be bound by an equitable judgment sustaining an alter ego action if the party's interests are so closely affiliated with the nonparty's interests that the interests are merged. *See, e.g.*, *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 169-70 (D.C. Cir. 1980); *In re 1438 Meridian Place, N. W., Inc.*, 15 B.R. 89, 95-96 (Bkrtcy. D.C. 1981); *Medlock*, 642 N.W.2d at 130. To the extent that West has other corporate alter egos besides the two which have been haled into court in this case, those alter egos are as bound by this decision as West himself is.

Under federal law, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of money which was legally due. *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986). Awarding prejudgment interest is intended to serve at least two purposes: to compensate prevailing parties for the true costs of money damages incurred, and, where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation. *Id.* Prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable. *Id.*; *see Masters*, 631 F.3d at 475.

In this case, there is a substantial question whether the amount of the liability was "reasonably capable of ascertainment," given the extensive discussion above regarding the determination of damages.[18] The Court acknowledges, as Kiewit points out, that whatever uncertainty presently exists is the defendants' fault. But it is also important to note that the damages awarded in this case consist of disgorgement, which distinguishes this situation from one in which the award is compensation for an injury inflicted on the plaintiff by the defendant. And the Court has already bolstered the damages award as a result of the defendants' spoliation of evidence. It is the Court's determination that under the circumstances of this case, the defendants' liability was not reasonably capable of ascertainment, and the Court's award is sufficient to make Kiewit whole.

And the Court reaches the same conclusion under Nebraska law, which arguably sets an even higher bar for determining when a claim is liquidated and prejudgment interest is recoverable. *See Countryside Co-op v. Harry A. Koch Co.*, 790 N.W.2d 873, 889 (Neb. 2010). A claim is liquidated only where there is "no reasonable controversy" and "no dispute" as to the plaintiff's right to recover or the amount of the recovery. *Id.* And the evidence must furnish data which, if believed, makes it possible to compute the amount exactly, "without reliance on opinion or discretion." *Lincoln Benefit Life Co. v. Edwards*, 243 F.3d 457, 463 (8th Cir. 2001) (quotation omitted). That standard cannot be met here.

## V. CONCLUSION

For the foregoing reasons, the Court will enjoin the defendants from further use or dilution of the plaintiff's mark, and will award compensatory

---

[18] And, the Court notes that had the defendants played it straight during this litigation, there might still have been injury and causation issues relevant to determining damages.

damages, costs, and attorney fees in the total amount of $913,099.46, payable jointly and severally by West and the Wall Street entities. In addition, based on the defendants' evasive business practices and the unlikelihood of a valid appeal (given their default), the Court finds good cause, pursuant to 28 U.S.C. § 1963, to authorize immediate registration of the judgment in any district where the defendants may be located.

IT IS ORDERED:

1.    Judgment will be entered for Kiewit, and against West, the Wall Street Equity Group, and the Wall Street Group of Companies, jointly and severally, in the amount of $913,099.46.

2.    Kiewit's claims against Friedman are dismissed with prejudice.

3.    West, the Wall Street Equity Group, the Wall Street Group of Companies, and any entity under West's control, are permanently enjoined from:

   a.    Using the Kiewit mark or any substantially similar mark in connection with representations to their clients and potential clients and otherwise infringing, diluting, and disparaging the Kiewit mark.

   b.    Making any representations which suggest that they have some association, approval, or authorization from Kiewit, or that Kiewit is an interested buyer in the businesses represented by or associated with them.

   c.    Engaging in unfair competition or deceptive trade practices.

4.    A separate judgment will be entered.

5.    Kiewit may immediately register the Court's judgment in the Southern District of Florida, or any other district court where the defendants or their assets may be found.

Dated this 29th day of September, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge